**Bolen WEBB and Cornelia Webb, Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.**

**No. 24112.**

United States Court of Appeals
Fifth Circuit.

April 23, 1968.

Robert L. Blumenthal, Jack Gray Johnson, John Andrew Martin, Robert L. Blumenthal, Carrington, Johnson & Stephens, Dallas, Tex., for appellants.

Lester R. Uretz, Chief Counsel, I.R.S., Eugene F. Colella, Atty., I.R.S., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Joseph M. Howard, Lawrence B. Silver, Jonathan Cohen, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES, GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

We have for review a two-pronged decision of the Tax Court. Bolen Webb and Cornelia Webb, T. C. Memo 1966–81 (April 20, 1966). One prong relates to deficiencies in reporting income tax liability, and the other relates to their sometimes consort, the 50% fraud penalty. The taxpayers, Bolen Webb and his wife Cornelia Webb (hereinafter Webb), seek our disavowal of the Tax Court's findings and conclusions on both prongs. We see no reason for such disavowal as to either the deficiency or the fraud and affirm.

The years during which Webb's income is in question are 1958, 1959, and 1960. The aggregate dollar amounts in question are $30,076.34 for the deficiency and $15,038.17 for the concomitant fraud penalty. 26 U.S.C. § 6653(b).[1]

Webb has been in the retail liquor business in Dallas, Texas, since 1946. During the years involved in this controversy, 1958 to 1960, he operated three retail liquor stores; and in July, 1960, he began operating a fourth store.

The Webbs' first encounter with the Commissioner occurred in 1958, when he challenged their joint returns for the years 1956 and 1957. These returns had reported income from Webb's three liquor stores as follows:

|  | 1956 | 1957 |
|---|---|---|
| Sales | $76,713.00 | $65,701.90 |
| Cost of Sales | 57,450.00 | 46,949.70 |
| Gross Profit | 19,263.00 | 18,752.20 |
| Expenses | 19,746.97 | 18,212.00 |
|  | ($ 483.97) | $ 525.20 [2] |

---

1. 26 U.S.C.A. § 6653(b) (1967):
"If *any part of any underpayment* (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a)." (Emphasis added.)

2. An arithmetic error on the return was not corrected.

The returns were investigated by Internal Revenue Agent Fred A. Bush between August of 1958 and June of 1960. Finding Webb's books and records inadequate, Agent Bush reconstructed his income, using a 20% mark-up on the known cost of sales. As Bush later testified, the 20% mark-up was a compromise adjustment agreed upon by Bush, Webb, and J. L. Lobdell who operated a tax and bookkeeping service and who had prepared Webb's 1956 and 1957 returns. Bush thus reconstructed Webb's Net Profit and Unreported Net Income for the years 1956 and 1957 as follows:

|  | 1956 | 1957 |
|---|---|---|
| Sales | $128,861.32 | $141,538.02 |
| Cost of Sales | 107,384.44 | 117,948.35 |
| Gross Profit | 21,476.88 | 23,589.67 |
| Expenses | 10,608.28 | 13,088.89 |
| Net Profit | 10,868.60 | 10,500.78 |
| Net Profit Reported | ( 483.97) | 525.20 |
| Unreported Net Income | $11,352.57 | $ 9,975.58 |

Based on these figures, the Webbs were assessed the following additional taxes and a 50% fraud penalty:

|  | 1956 | 1957 |
|---|---|---|
| Tax Deficiency | $1,760.46 | $1,654.60 |
| Fraud Penalty under 26 U.S.C. § 6653(b) | 880.23 | 827.30 |
| Total | $2,640.69 | $2,481.90 |

Webb signed a Form 870 agreement (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) regarding the assessment for the years 1956 and 1957.

The prophetic sting of the $5,122.59 tax assessment was reenforced by several warnings for Webb to keep better records. In June of 1959 Agent Bush advised Webb that the Internal Revenue laws require all taxpayers to keep sufficient records and that Webb should keep in permanent form a daily record of the money which he took in and of all purchase invoices and receipts. A month later the District Director of Internal Revenue in Dallas, Texas, sent Webb a letter advising him of his duty to keep accurate and complete business records and reprimanding Webb for his past failure to do so. The letter reads as follows:

"[Y]our current records were found to be inadequate in the following respects: No books and records of any sort were maintained. Receipts were not deposited or recorded. Inventories were based on loose estimates rather than actual physical count and valuation. Rental income and expenses were not recorded.

\*  \*  \*  \*  \*  \*

Each taxpayer is required by law to make a return of his true income. He must, therefore, maintain such accounting records as will enable him to do so. \* \* \*

\* \* \* \* \* \*

This notice to you of the requirements of the law and regulations with respect to maintaining such permanent books of account and records \* \* \* as will enable you to make a return of your true income and also will enable examining officers of the Internal Revenue Service to determine the correct amount of income subject to tax."

Moreover, on several occasions in 1958 and 1959 Lobdell talked to Webb about the necessity of maintaining adequate records. He recommended that Webb keep a detailed record of receipts for all expenditures and purchases and a daily record of all sales from each store.

Despite the above presagements Webb refused to alter his bookkeeping in any significant manner. In the latter part of 1958 he did begin keeping part of his invoices in a whiskey box. However, some of the invoices were lost or misplaced, so that he was unable to furnish the revenue agent who conducted a subsequent examination with a complete record of his purchases during 1958, 1959, and 1960. During 1960 Webb kept a "cash receipts book" containing weekly entries of his sales for that year. Not only was the book incomplete, containing entries for only 48 weeks of the year 1960, but also it was totally disregarded in determining Webb's taxable income for 1960. The gross sales which Webb reported for the taxable year 1960 were approximately $18,000 *less* than the gross sales recorded in the admittedly incomplete "cash receipts book."

Webb did not ring up all cash sales on the cash registers of his business, and he did not deposit all of his receipts in bank accounts. Although he maintained accounts in one bank during the three-year period and in a second bank for six months during the period, he was unable to locate all of his canceled checks and other banking records for 1958, 1959, and 1960.

The Webbs' joint income tax returns for 1958, 1959, and 1960 reported income from their retail liquor business as follows:

|  | 1958 | 1959 | 1960 |
|---|---|---|---|
| Sales | $101,218.73 | $101,121.62 | $110,381.12 |
| Cost of Sales [3] | 91,345.05 | 91,000.58 | 100,150.70 |
| Gross Profits | 9,873.68 | 10,121.04 | 10,230.42 |
| Expenses | 10,001.13 | 10,008.60 | 9,622.36 |
| Net Profit | $( 127.45) | $ 112.44 | $ 608.06 |

These returns reported the following inventories and inventory purchases, with the resulting cost of sales:

|  | 1958 | 1959 | 1960 |
|---|---|---|---|
| Opening Inventory | $10,000.00 | $10,000.00 | $ 10,000.00 |
| Inventory Purchases | 88,419.30 | 87,551.00 | 97,670.00 |
| Total | 98,419.30 | 97,551.00 | 107,670.70 |
| Ending Inventory | 10,000.00 | 10,000.00 | 12,000.00 |
| Costs of Sales | $88,419.30 | $87,551.00 | $ 95,670.70 |

---

3. These figures also include employees' wages and materials and supplies expenses in addition to cost of goods sold.

In September of 1961 Revenue Agent Larry Kelley was assigned to investigate the Webbs' 1958, 1959, and 1960 returns. He found Webb's books and records to be totally inadequate. Likewise, after examining Webb's canceled checks and his primary bank's microfilm of Webb's canceled checks, bank statements, and deposit slips, Agent Kelley was no more enlightened. He thus estimated Webb's liquor income by the percentage mark-up method, as had been done regarding the 1956–57 settlement.

Kelley examined the records of all of Webb's wholesalers and found that Webb had reported about one-half of the actual purchases on his tax returns. His actual inventory purchases had been as follows:

|  | 1958 | 1959 | 1960 |
|---|---|---|---|
| Liquor and Wine | $151,773.13 | $173,006.08 | $179,055.34 |
| Beer | 12,949.16 | 16,417.88 | 23,641.60 |
| Total | $164,722.29 | $189,423.96 | $202,696.94 |

There was also a discrepancy between the opening inventory reported on the 1958 return and the closing inventory agreed to in the 1956–57 settlement; therefore, Kelley recomputed Webb's cost of sales using both the new purchase figures and the opening inventory determined by the 1956–57 settlement. His computations resulted in the following statement of cost of sales:

|  | 1958 | 1959 | 1960 |
|---|---|---|---|
| Opening Inventory | $ 13,000.00 | $ 10,000.00 | $ 10,000.00 |
| Inventory Purchases | 164,722.29 | 189,423.90 | 202,696.94 |
| Total | $177,722.29 | $199,423.96 | $212,696.94 |
| Ending Inventory | 10,000.00 | 10,000.00 | 12,000.00 |
| Cost of Sales | $167,722.29 | $189,423.96 | $200,696.94 |

Using a 25% mark-up from cost of sales (the propriety of which will be discussed infra) Kelley determined Webb's net profit and unreported income as follows:

|  | 1958 | 1959 | 1960 |
|---|---|---|---|
| Sales (125% of Cost of Sales) | $209,652.86 | $236,779.95 | $250,871.15 |
| Cost of Sales | 167,722.29 | 189,423.96 | 200,696.92 |
| Gross Profit | 41,930.57 | 47,355.99 | 50,174.23 |
| Expenses [4] | 12,376.88 | 13,673.87 | 16,965.56 |
| Net Profit | 29,553.69 | 33,682.12 | 33,208.67 |
| Net Profit Reported | ( 127.45) | 112.44 | 608.06 |
| Unreported Net Income | $ 29,681.14 | $ 33,569.68 | $ 32,600.61 |

4. Agent Kelley allowed Webb substantially greater expenses than Webb had originally reported. Kelley testified as follows:

"Well, I allowed Mr. Webb actually more than he had claimed on his return. During the course of the examination he

The Commissioner assessed Webb for both the tax deficiency and a 50% fraud penalty:

|  | 1958 | 1959 | 1960 |
|---|---|---|---|
| Tax Deficiency | $ 9,413.74 | $10,101.14 | $10,561.46 |
| Fraud Penalty Under 26 U.S.C. § 6653(b) | 4,706.87 | 5,050.57 | 5,280.73 |
|  | $14,120.61 | $15,151.71 | $15,842.19 |

The total monetary demand on Webb was $45,114.51.

Before the Tax Court, as before this Court, Webb attacked the assessment in three areas: (1) the use of the percentage mark-up without regard for net worth considerations, (2) the use of a mark-up percentage of 25% for determining gross sales, and (3) the ascription of fraud to Webb in the filing of his tax returns. Our analysis will focus on these three areas.

> (1) Use of the Percentage Mark-up Method sans Net Worth Considerations

It is conceded that Webb had no adequate books and records to reflect his income during the contested years. Webb contends, however, that a net worth analysis of his financial status

in 1958, 1959, and 1960 shows that he could not possibly have earned $96,444.48, which the Commissioner, using the percentage mark-up method determined to be his total liquor business income. In Webb's brief he states in part, "Ignoring the undisputed testimony as to Petitioner's net worth was clear error. * * In no other percentage mark-up case have considerations of net worth been totally disregarded."

Our analysis starts with the basic principle that Webb, along with every taxpayer, must maintain accounting records which enable him to file a correct tax return. 26 U.S.C. § 6001; Section 1.446–1, Income Tax Regs.[5] Because Webb's records did not clearly reflect his income, the Commissioner was authorized to use such methods as in

came up with a few additional receipts, cancelled checks and while he didn't have near all of the receipts and cancelled checks to support all of his expenses, I allowed an amount in excess of what he actually reported on the return."

5. 26 U.S.C.A. § 6001 (1967):
"NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS.
Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate may from time to time prescribe. Whenever in the judgment of the Secretary or his delegate, it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render

such statements, or keep such records, as the Secretary or his delegate deems sufficient to show whether or not such person is liable for tax under this title. Aug. 16, 1954, c. 736, 68A Stat. 731." 26 C.F.R. § 1.446–1 (1967):
"*General rule for methods of accounting*
    (a) *General rule.* * * *
    *        *        *        *        *
    (4) Each taxpayer is required to make a return of his taxable income for each taxable year and must maintain such accounting records as will enable him to file a correct return. See section 6001 and the regulations thereunder. Accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on his books of account and on his return, as for example, a reconciliation of any differences between such books and his return. * * *"

his opinion clearly reflected that income. 26 U.S.C. § 446(b).[6]

■ The determination of taxable income by the Commissioner is presumptively correct. Anson v. C.I.R., 10 Cir. 1964, 328 F.2d 703, 706; Breland v. United States, 5 Cir. 1963, 323 F.2d 492, 496; Mendelson v. C.I.R., 7 Cir. 1962, 305 F.2d 519, 522, cert. den., 371 U.S. 877, 83 S.Ct. 149, 9 L.Ed.2d 114; Klassie v. United States, 8 Cir. 1961, 289 F.2d 96, 100. See also Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Broadhead's Estate v. C. I. R., 5 Cir., 391 F.2d 841, March 5, 1968. The Tax Court's approval of that determination will not be set aside by this Court unless clearly erroneous. 26 U.S.C. § 7482(a); Fed. R.Civ.P. 52(a);[7] Browne v. C.I.R., 4 Cir. 1966, 367 F.2d 386, 387; Anson v. C.I.R., supra, 328 F.2d at 706–707; Agnellino v. C.I.R., 3 Cir. 1962, 302 F.2d 797, 799. See also C.I.R. v. Duberstein, 1960, 363 U.S. 278, 289–292, 80 S.Ct. 1190, 4 L.Ed.2d 1218, 1227–1229; Estate of Sam E. Broadhead v. C.I.R., supra. Especially when the taxpayer has defaulted in his task of supplying adequate records, he is not in a position to be hypercritical of the Commissioner's labor. As we said in Bernstein v. C.I.R., 5 Cir. 1959, 267 F.2d 879, 881:

"It is immaterial whether the Commissioner proceeded upon a wrong theory in determining the deficiency, and the taxpayer has the burden of showing that the assessment is wrong on any proper theory."

Webb's broad assertion that net worth determinations are always considered is not supported by the cases. In Kurnick v. C. I. R., 6 Cir. 1956, 232 F.2d 678, for example, the Sixth Circuit affirmed a deficiency and fraud assessment under the percentage mark-up method without mentioning net worth considerations. Eleven years later the same Circuit upheld a deficiency and fraud assessment despite the taxpayer's contention that his net worth computations had successfully countered the Commissioner's percentage mark-up estimate. The Tax Court had dismissed the contention by noting that "the petitioners did not introduce any evidence to show the correctness of the items contained therein." Carmine Bollella, 24 T.C.M. 858 (1965), aff'd., Bollella v. C.I.R., 6 Cir. 1967, 374 F.2d 96. Although in the case at bar Webb did introduce "testimonial evidence" as to his net worth, we question whether his self-serving statements satisfy the quest of the *Bollella* courts. We refer to Miller v. C. I. R., 5 Cir. 1956, 237 F.2d 830, where the Commissioner's reconstruction of income under the "bank deposit method" was challenged by a net worth attack. As in this case, the taxpayer's integrity had been placed in doubt, and we concluded as follows:

"The taxpayer complains that the agent should have followed the increase in net worth method of computation.

---

6. 26 U.S.C.A. § 446 (1967):
"GENERAL RULE FOR METHODS OF ACCOUNTING
&ast; &ast; &ast; &ast; &ast;
(b) *Exceptions.*—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.
&ast; &ast; &ast; &ast; &ast;
Aug. 16, 1954, c. 736, 68A Stat. 151."

7. 26 U.S.C.A. § 7482 (1967):
"§ 7482. Courts of Review
(a) Jurisdiction.—The United States Courts of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court &ast; &ast; &ast; in the *same manner* and to the *same extent* as *decisions of the district courts in civil actions tried without a jury*; &ast; &ast; &ast; Aug. 16, 1954, c. 736, 68A Stat. 890; Nov. 2, 1966, Pub. L. 89–713, § 3(c), 80 Stat. 1109." (Emphasis added.)
Fed.R.Civ.P. 52 (1967 Supp.):
"Rule 52. Findings by the Court
(a) Effect. &ast; &ast; &ast; Findings of fact shall not be set aside unless *clearly erroneous,* and due regard shall be given to the opportunity of the trial court to *judge of the credibility of the witnesses.* &ast; &ast; &ast; as amended Jan. 21, 1963, eff. July 1, 1963." (Emphasis added.)

* * * There can be no requirement that the Commissioner use for his calculation of income a method which depends absolutely for its accuracy on the taxpayer's voluntary disclosure of his assets at the end of the period in a case where the court rejected his contention that he had a large amount of cash at the beginning of the period and when he overlooked a bank account of $5,000 at the end of the period." 237 F.2d at 838.

For Webb the percentage mark-up method was the most reasonable means of computing income because his cost of sales in each taxable year was known with certainty. In comparison, net worth or bank deposit computations would lack any known figure because Webb transacted a substantial amount of his liquor business in cash, and he readily commingled cash flowing to and from personal and business expenses. The supposed disparity between the percentage mark-up and net worth determinations is based almost exclusively on Webb's own testimony concerning his property, expenses, and money hoards. Moreover, the Commissioner did disclose possible unreported income drains in the elimination of certain debts and the purchase in 1959 of two new air-conditioned Cadillacs.

■ We recognize that the absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes. Gasper v. C. I. R., 6 Cir. 1955, 225 F.2d 284. See also Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623. But such absence does weaken any critique of the Commissioner's methodology. Mendelson v. C. I. R., supra, 305 F.2d at 523.

■ Arithmetic precision was originally and exclusively in Webb's hands, and he had a statutory duty to provide it. He did not have to add or subtract; rather, he had simply to keep papers and data for others to mathematicize. Having defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination. Nor should he be overly chagrined at the Tax Court's reluctance to credit every word of his negative wails. See Breland v. United States, supra, 323 F.2d at 496 (at [3–5]); Mendelson v. C. I. R., supra, 305 F.2d at 521 (at [1]).

### (2) Mark-up Percentage of 25% for Determining Gross Sales

Predictably, Webb claims that the Commissioner's mark-up percentage of 25% is arbitrary and unreasonably high. His major argument is that shelf prices, upon which the mark-up percentage was based, are not reliable representations of selling prices because his stores regularly granted liberal discounts. He adds that even selling prices do not accurately report income because of the magnitude of business inefficiency and theft in his stores. The Tax Court considered all of Webb's contentions and found that a mark-up of 25% was fair and reasonable for Webb's business during the years 1958 through 1960. After a brief recitation of the relevant facts, we will discuss the eight specific areas in which Webb challenges the 25% mark-up figure. In doing so, however, we emphasize that the same presumptions of verity are accorded to Commissioner and Tax Court determinations here as in Section (1) of this opinion, supra.

Revenue Agent Kelley began his investigation of Webb's 1958, 1959, and 1960 income tax returns in September of 1961. As has been mentioned previously, Kelley computed the cost of sales by obtaining accurate records from Webb's suppliers. To arrive at a mark-up percentage, he first averaged the 1959 and 1960 shelf prices of what, according to Webb, were the eighteen best selling items.[8] Based on these shelf prices, the

8. Webb told Kelley that the 1960 shelf prices were substantially the same as the then-listed 1961 shelf prices which Kelley used to compute the 1960 mark-up. For the year 1959 Kelley used the 1959 shelf prices taken down by Revenue Agent Bush during his examination of the years 1956 and 1957.

average mark-up on all of Webb's most popular brands in all sizes was computed to be 34.25% over cost for 1959 and 30.50% for 1960. The average mark-up on these brands in the most frequently sold half-pint sizes was 36.68% and 32.-64% for 1959 and 1960, respectively. Kelley reduced the average mark-up to 25% to account for "any possible discounts or losses for breakage, theft, minor changes of price during the year." Using this mark-up of 25%, Kelley reconstructed Webb's sales for each of the three years and deducted therefrom the costs of sales and business expenses.

The eight specific challenges will be considered separately.

*Discount of odd pennies.* J. T. Lightner, one of Webb's store managers, testified that he would "knock off the pennies, if the shelf price of the bottle was any price not divisible by five. Although Lightner indicated that this was Webb's policy for all stores,[9] he never explicitly stated that, and no other witness—including Webb himself—even mentioned that pennies were discounted at any other store. Moreover, *no* shelf prices in the computations for 1959 included odd-penny amounts. Therefore, we find the "odd-penny discount" computations found in Webb's brief (which still obtained a mark-up percentage above 25%) to be totally unconvincing.

*Quantity discounts.* Webb asserts in his brief: "Every person who ever sold liquor in Petitioner's store testified that he gave large discounts on quantity sales. * * *" We need not attack the verity of that statement; we will instead analyze its persuasive power. Both Bolen and Cornelia Webb testified that they granted five to twenty-cent discounts on quantity sales (more than five bottles). Jewel Jackson, a store manager, corrobo-

rated the Webbs and added that he often sold a twelve-bottle case of Thunderbird wine for $7.50 (by 1960 wholesale prices, only a 7.59% mark-up). J. T. Lightner testified that he occasionally made quantity sales at a discount, but only after calling Webb for his approval. J. D. Cooper, who managed a store which was open only six months during the three-year period involved, testified that he "sold a lot of whiskey to bootleggers" without telling Webb. However, he also testified that some of his shelf prices were higher than those used by Kelley in determining Webb's mark-up. None of the above stated what percentage of their business was in quantity discount sales.

Especially as to the testimony of Lightner and Cooper, the Commissioner's allowance for discounts seems generous enough. As to the testimony of the Webbs and Jackson, even if substantial discounting can be inferred, the Tax Court was justified in "discounting" the testimony due to an interest in the proceedings. See Archer v. C. I. R., 5 Cir. 1955, 227 F.2d 270, 273. Jackson, for instance, was still employed by the Webbs at the time of the Tax Court hearing, and his testimony was impeached by Revenue Agent Kelley's recitation of a prior conversation with Jackson.

*General discounting procedures.* It is true that all witnesses testified to the practice of discounting from five to twenty-five cents on certain sales to meet the competition of other stores. Webb's testimony on this regard is typical:

"Sometime—well, people would come in often and say I am short and would like a nickel having and sometimes fifteen cents having the price and I would say let them have it."

The same problems of frequency and credibility plagued Webb in this chal-

9. On direct examination, Lightner testified:
   "Lightner: Yes, we didn't use any pennies at all.
   Q: Was the instruction you had from Mr. Webb?
   Lightner: Yes."
   On redirect examination, Lightner testified:

   "Lightner: * * * Are you talking about the time when I would knock off pennies?
   Q: That is right.
   Lightner: Well, it would just be four pennies knocked off. He wasn't using the pennies at all. He wasn't using any pennies."

lenge as they did concerning the quantity sales. Moreover, Webb himself testified twice that in more than half his sales no discounts were given. In its appellate brief the government has computed the mark-up percentages (1) if all sales were discounted ten cents from shelf prices and (2) if half of the sales were discounted ten cents from shelf prices. The following computations show that the 25% general mark-up was a reasonable one:

|  | 1959 | | 1960 | |
|---|---|---|---|---|
|  | All Sales | Half-Pints | All Sales | Half-Pints |
| At Shelf Prices | 34.28% | 36.68% | 30.50% | 32.64% |
| At 10 cents Discount per Bottle | 28.50% | 27.49% | 23.92% | 23.70% |
| At 10 cents Discount in Half the Sales | 31.39% | 32.08% | 27.21% | 28.17% |

———————◆———————

*Change in shelf price.* Webb contends that Revenue Agent Kelley failed to take into account any shelf price changes from 1960, the last tax year involved here, to 1961, the year in which Kelley computed mark-up from the current shelf prices. As mentioned in footnote 8 supra and as found by the Tax Court, the 1960 and 1961 shelf prices were substantially the same. The Tax Court granted that "[t]here had been a minor shelf price change in 1960." However, Webb did not show how substantial this "minor change" was.

*Unweighted mark-up.* Webb criticizes Revenue Agent Kelley for making "no effort to arrive at a weighted average" of the eighteen items used to compute the mark-up percentage. The Tax Court found that the failure to weigh was due to the difficulty of assigning weights to the $500,000 worth of liquors, beers, and wines and the thousands of bottles of different brands which Webb sold. The Tax Court also noted that the average profit on half-pint bottles, which constituted most of Webb's sales, was larger than the average profit of all the bottles. We add that Webb on appeal has shown neither his cooperation in seeking a weighted average nor injury to him in Kelley's failure to compute a weighted average.

*Inefficiency and theft.* Webb asserts that the 25% mark-up does not provide for substantial losses caused by inefficient operations, employee thefts, and credit losses. We note that Webb claimed on his returns, and was allowed, the following deductions from gross profits for bad check losses: $902.46 for 1958, $943.80 for 1959, and $522.96 for 1960. These allowed losses, therefore, could have no effect on the Commissioner's determination of gross profit or net income. As to other, purely testimonial, evidence of reduced income due to inefficient operations and credit losses, we find no clear error in the Tax Court's failure to be convinced.

Webb claimed employee theft in the cases of Lightner and Cooper. Having no direct evidence as to Lightner, he attempted to reconstruct Lightner's income and expenditures to show that Lightner was taking from the till. Webb's enthusiasm and diligence in this income determination would have been appreciated in the determination of his own income. However, even here there are substantial gaps, and Webb's willingness to keep Lightner in his employ through the end of 1962 weakens his argument considerably. As to Cooper, Webb presented more direct evidence, the fact that police arrested Cooper for coming out of his store with whiskey "before day." But this incident occurred in 1964. There is no evidence that Cooper stole substantial amounts during the first six months

of his employment, June through December of 1960.

■ Under Section 165(e) of the Internal Revenue Code [10] a taxpayer is entitled to a theft loss only in the year of discovery and only if he can prove that a theft in fact occurred and will not be reimbursed. Bodzy v. C.I.R., 5 Cir. 1963, 321 F.2d 331, 335; Naegle v. C.I.R., 9 Cir. 1967, 378 F.2d 397. While we do not hold that this section prevents Webb from offsetting the mark-up percentage with specific or specifically recurring losses, it does indicate a reluctance to grant liberal income deductions several years after the fact. See also Marcello v. C.I.R., 5 Cir. 1967, 380 F.2d 494, 496–497; Patterson v. Pizitz, Inc., 5 Cir. 1965, 353 F.2d 267, 269–270, cert. den., 1966, 383 U.S. 910, 86 S.Ct. 895, 15 L.Ed. 2d 666. Cf. Anderson v. C.I.R., 5 Cir. 1957, 250 F.2d 242, cert. den., 1958, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844.

*Comparison with 1956–57 deficiency.* Webb urges that the Tax Court ignored the conduct of his business in prior years. For the two prior years the parties agreed to a settlement based on a 20% mark-up on costs of sales of $107,384.-44 and $117,948.35. For the years involved in this dispute, Webb's business expanded considerably and his costs of sales were $167,722.29 for 1958, $189,-423.96 for 1959, and $200,696.94 for 1960. This increased level of business activity with relatively constant business expenses accounts for much of the increase in net income for the year 1958. Moreover, the 20% mark-up for 1956 and 1957 was a figure agreed to in a discussion among Revenue Agent Bush, Webb, and bookkeeper Lobdell. Bush testified that he had determined that 25% was an appropriate mark-up but that he had reduced it to 20% in settlement. He testified that he thought a 20% mark-up

was reasonable for the years 1956 and 1957, but he also testified that he made no examination of 1959 costs, did not compute a mark-up for 1959, and did not think that 20% was a reasonable mark-up for 1959. We find no evidence concerning Webb's business in 1956 and 1957 which seriously disparages Agent Kelley's determinations for 1958 through 1960.

*Comparison with other businesses.* Bill Barnes, whose bookkeeping services were solicited by Webb in 1962, testified that a reasonable mark-up for liquor stores in the area was less than twelve per cent. The testimony mentioned no specific period of time, and, as the Tax Court found, Webb presented no evidence of prices charged in other stores or of a similarity of pricing and discount practices among liquor dealers. Webb's own shelf prices indicated a much higher mark-up, and he testified that he sold at shelf prices more than half the time. The Tax Court was not clearly erroneous in disregarding Barnes' testimony.

In conclusion we acknowledge Webb's plea to view the totality of his business circumstances. In his appellate brief he concludes:

"As to all of the foregoing, the Tax Court holds that all of these items were properly allowed for in the six percent reduction [down to 25%]—swept under the rug, if you please. It is clear that the 6% reduction does not have the elasticity the Tax Court accords it; it can be stretched only so far, and not in so many different ways."

This criticism may have surface plausibility, but the fault for failure lies in Webb himself. He has contented himself by shafting darts of criticism, but each dart lacks substantive power. There are X's in the Commissioner's

---

10. 26 U.S.C.A. § 165 (1967):
    "165. Losses
        (a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

*    *    *    *    *

    (e) Theft losses.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss."

equation, but the formula is reliably correct, and the X's were not filled in by Webb. The Commissioner's computations were supported by reason and experience. Webb underestimates his burden if he thinks that, after defaulting in his original duty, he need merely testify to the Commissioner's lack of precision.

In Cefalu v. C.I.R., 5 Cir. 1960, 276 F.2d 122, 126, this Court stated:

"If the taxpayer shows that part of the Commissioner's determination was wrong, it does not destroy the presumption of correctness that attaches to his findings. Anderson v. Commissioner, 5 Cir. 1957, 250 F.2d 242, certiorari denied 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844."

In Miller v. C.I.R., 5 Cir. 1956, 237 F.2d 830, 838–839, this Court granted that the taxpayer had pointed out specific areas where the Commissioner's recomputation method had failed to reflect his true income. Nevertheless, we concluded:

"In no case did the actual invoices proven by the taxpayer even approximate the figure allowed him by the Tax Court for any particular year. The court did the best it could under the circumstances, and we cannot arrive at any different figures. On this phase of the decision, therefore, the Tax Court's computation must stand." 237 F.2d at 839.

See also Patterson v. Pizitz, Inc., supra; Anson v. C.I.R., 10 Cir. 1964, 328 F.2d 703, 707; Breland v. United States, 5 Cir. 1963, 323 F.2d 492, 496; Mendelson v. C.I.R., 7 Cir. 1962, 305 F.2d 519, cert. den., 371 U.S. 877, 83 S.Ct. 149, 9 L.Ed.2d 114; Archer v. C.I.R., 5 Cir. 1955, 227 F.2d 270, 273–74.

█ The Commissioner's 25% base, while perhaps not overly generous, was neither arbitrary nor capricious. Discounts, losses, theft—all the elements claimed by Webb—were taken into consideration. Webb has failed to supply us with the factual primates of further reduction, even in retrospective analysis.

(3) Fraud

█ The appellate court's role in reviewing cases of civil tax fraud entails unique, though not exclusive, dualistic frustrations. To affirm for the Commissioner, we must agree that he has proved fraud by "clear and convincing evidence." Moreover, what he has proved must be fraud, not mere negligence or even gross negligence. Judge Brown has analyzed the tests in Carter v. Campbell, 5 Cir. 1959, 264 F.2d 930, 935–936:

"There is first the matter of what is and what is not fraud. We have recently given our approval, Olinger v. Commissioner of Internal Revenue, 5 Cir. 1956, 234 F.2d 823, 824, to the strong language of Davis v. Commissioner of Internal Revenue, 10 Cir. 1950, 184 F.2d 86, 87, 22 A.L.R.2d 967. 'Fraud implies bad faith, intentional wrongdoing and a sinister motive. It is never imputed or presumed and the court should not sustain findings of fraud upon circumstances which at most create only suspicion.' Equally emphatic is that stated for us by Judge Sibley in Mitchell v. Commissioner, 5 Cir. 1941, 118 F.2d 308, 310. 'Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute. The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either.' These principles have been restated frequently and recently with no recession either from emphatic language or like application. Goldberg v. Commissioner of Internal Revenue, 5 Cir. 1956, 239 F.2d 316, 321; Fairchild v. United States, 5 Cir. 1957, 240 F.2d 944, 947; Eagle v. Commissioner of Internal Revenue, 5 Cir. 1957, 242 F.2d 635, 638; Jones v. Commissioner of Internal Revenue, 5 Cir. 1958, 259 F.2d 300.

See also 10 Mertens, Federal Income Taxation § 55.10.

"Added to this is the burden placed upon the Commissioner. The Code places it expressly upon the Commissioner. 10 Mertens, Federal Income Taxation § 55.18. 'The burden is upon the Commissioner to prove affirmatively by clear and convincing evidence actual and intentional wrongdoing on the part of the petitioner with a specific intent to evade the tax.' Eagle v. Commissioner of Internal Revenue, 5 Cir. 1957 242 F.2d 635, 637. 10 Mertens, supra, at § 55.16."

On the other hand, to reverse we must find that the Tax Court's determination of fraud was "clearly erroneous" as to *all* items which comprise the deficiency. See footnotes 1 and 7, supra. We quote Judge Jones in Toledano v. C.I.R., 5 Cir. 1966, 362 F.2d 243, 247:

"The statute reads that 'if any part of any deficiency is due to fraud with intent to evade tax' the fraud penalty may be imposed and the bar of limitations is avoided. 26 U.S.C.A. (I.R.C. 1939) §§ 293(b), 276(a), now 26 U.S.C.A. §§ 6653(b), 6501(a). Thus, the Commissioner need only prove that some portion of the deficiency is due to fraud. Ginsberg v. Commissioner of Internal Revenue, 5th Cir. 1959, 271 F.2d 511. A finding of fraud by the Tax Court is generally treated as a fact finding which is not to be disturbed unless clearly erroneous. Helvering v. Keho, 309 U.S. 277, 60 S.Ct. 549, 84 L.Ed. 751 (1940); Steiner v. Commissioner of Internal Revenue, 7th Cir. 1965, 350 F.2d 217; Schroeder v. Commissioner of Internal Revenue, 8th Cir. 1961, 291 F.2d 649, cert. den., 368 U.S. 985, 82 S.Ct. 598, 7 L.Ed.2d 523 (1962); Kenney v. Commissioner of Internal Revenue, 5th Cir. 1940, 111 F.2d 374."

■ A summary of the above standards demonstrates their tutorial limitations: We must determine whether it is *clearly* erroneous that the taxpayer's intent to defraud the government was proven, as to any part of the deficiency, by *clear and convincing* evidence. Our path in fraud determinations is even more obstacle-pocked because we have no cinematography of the mind nor do we have books approaching impeccable accuracy. Nevertheless, courts have attempted to avoid deciding each case viscerally and have established certain factual checklists.[11]

■ The factor most often discussed is the deficiency itself. Although fraud

11. The following list of fraud indicia is found in Balter, Tax Fraud and Evasion, pp. 8–54 and 8–55 (3 ed. 1963):

"1. Intentional understatement of income, substantial in amount per se or substantial in relation to the total reported income

2. Intentional overstatement of deductions, susbtantial in amount per se or substantial in relation to the total reported income

3. Recurrence of the understatement of income or overstatement of deductions for more than one tax year .

4. Secret bank deposits for income or bank deposits made in the names of nominees or dummies

5. Undisclosed source of income and from other than taxpayer's regular business, or undisclosed income from business or transactions really that of the taxpayer but conducted in the names of dummies or nominees

6. Undisclosed income derived from illegal business operated by taxpayer or from unlawful transactions, Particularly if the latter is of regular rather than sporadic nature

7. Lack of adequate books and records which one would expect of the particular taxpayer, based on his business experience, education, knowledge of books and records, etc.

8. False entries and other falsifications reflected in books and records kept by taxpayer or required to be furnished to government agencies

9. No reasonably acceptable explanation made by the taxpayer to the investigating agents or to the Tax Court as to why falsity appeared in the return

10. Conviction of the taxpayer on criminal evasion charges"

See also 10 Mertens, Federal Income Taxation § 55.10 et seq. and 6 CCH, Federal Tax Reporter § 5533 et seq.

cannot be inferred from the mere understatement of income, consistent and substantial underreporting is evidence of fraud. Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150, 166; Browne v. C.I.R., 4 Cir. 1966, 367 F.2d 386, 387; Bahoric v. C.I.R., 9 Cir. 1966, 363 F.2d 151, 154; Klassie v. United States, 8 Cir. 1961, 289 F.2d 96, 101–102; Cefalu v. C.I.R., 5 Cir. 1960, 276 F.2d 122, 129. This factor is relevant to our analysis because Webb's deficiencies in reporting were both consistent and substantial. He reported less than 49% of his sales in 1958, less than 43% in 1959, and less than 45% in 1960. He reported a total of $593.05 taxable business income for the three years while the Commissioner computed his taxable income to be $96,444.48. These are not miniscule mistakes.

Webb counters these figures by reminding us that they are based on reconstructed income determinations. He points out that we must not bootstrap him into a fraud penalty by means of presumed deficiencies. See Goldberg v. C.I.R., 5 Cir. 1956, 239 F.2d 316, 320. This is not a case where the deficiencies are small or where they comprise the total evidence against Webb. The evidence of Webb's fraudulently understating *some part* of his income is not only clear and convincing; it is well nigh compelling. In Merritt v. C.I.R., 5 Cir. 1962, 301 F.2d 484, 487, Judge Jones, who also authored the *Goldberg* case supra, brings Webb within the warrant of the Tax Court's discretion to find fraud:

"The mere understatement of income, standing alone, is not enough to carry the burden cast upon the Commissioner in seeking to recover fraud penalties. But each case is to be considered in the light of its own facts. Consistent and substantial understatement of income is by itself strong evidence of fraud. This proof, coupled with the showing that the records were both incomplete and inaccurate, and that the petitioner did not supply the bookkeeper with all

of the data necessary for maintaining complete and accurate records, is enough to warrant the Tax Court in finding fraud. Reaves v. Commissioner of Internal Revenue, 5th Cir. 1961, 295 F.2d 336; Cefalu v. Commissioner of Internal Revenue, supra; Bryan v. Commissioner of Internal Revenue, supra."

Once we get over Webb's abhorrence of the Commissioner's methodology in determining "how much" was underpaid, it remains undisputed that Webb owed taxes. We can add with certainty that Webb knew his records were inadequate. He knew that the figures he gave to his bookkeepers did not accurately reflect his income because he testified that he did not always record the day's sales. Moreover, his incomplete "cash receipts book" containing forty-eight weekly entries of his sales during 1960 showed gross sales during 1960 of approximately $18,000 in excess of the gross sales figure on his 1960 tax return.

Nor can we accept Webb's second defense that any deficiencies are attributable solely to ignorance and perhaps negligence. Iteration and reiteration have convinced us that Webb was short on schooling. He is pictured as untutored and unlearned, unconscious of any guilt, a man with an unburdened conscience. Yet, though we consider intelligence on our scales of culpability, the lack of schooling does not automatically register a zero. In Carmine Bollella, 24 T.C.M. 858 (1965), aff'd, Bollella v. C.I.R., 5 Cir. 1967, 374 F.2d 96, an immigrant with only a first grade education and with no knowledge of bookkeeping was assessed a penalty for civil tax fraud based on a deficiency determined by the percentage mark-up method. (The Tax Court's refusal to consider Bollella's net worth computations is mentioned supra.) The penalty was assessed despite Bollella's lack of formal education and despite the fact that Bollella's son managed the business, signed checks, received and deposited the business receipts, and was responsible for the preparation of the income tax returns. See also Bahoric v.

C.I.R., 9 Cir. 1966, 363 F.2d 151, 153 (Yugoslav immigrant with only a sixth grade education); Estate of Kalman Bernstein, T. C. Memo. 1956–260, CCH Dec. 22, 029(M), 1956, aff'd, Bernstein v. C.I.R., 5 Cir. 1959, 267 F.2d 879 (immigrant with "equivalent of third or fourth grade education"). Though Webb did not complete the fifth grade, he is a person of average intelligence and average business understanding. In 1958 he was no economic infant or adolescent; he was a successful businessman doing more than $200,000.00 volume annually. It traduces credibility that his furnishing less than half of his sales to his bookkeeper was due to inadvertence or negligence.

In crossing the thin line between negligence and fraud, we are reenforced by the recollection of Webb's 1956–57 experience. That which may have been initially negligent can become, after warning, willful and intentional by its continuity. Cf. Holland v. United States, supra, and Hamman v. United States, 9 Cir. 1965, 340 F.2d 145, 149, cert. den., 380 U.S. 977, 85 S.Ct. 1339, 14 L.Ed.2d 271, involving criminal tax fraud. We need not repeat the facts surrounding Webb's 1956–57 tax assessment and the warnings which followed. Such encounters with the tax authorities would teach one possessing elementary common sense that guessing—and guessing far below the mark—is not permitted. Though the accusing finger had pointed, Webb continued his under-reporting without interval. Ignorance may be a sometime haven, but it is not an all-time refuge from scienter.

The Tax Court found fraud after carefully weighing Webb's solemn words of innocence and poverty. That Court had the benefit of live testimony where the demeanor of the witnesses would be gauged and evaluated. Our veto power on the Tax Court's conclusion as to credibility is not of Niagara proportions.

Synopsizing, we find (1) persistent and large deficiencies, (2) admittedly false information given to bookkeepers, (3) unheeded warnings to keep adequate records, and (4) an agreement as to fraud in prior years. Tax evaders seldom leave tracks and therefore circumstances can be convincing. Though an isolated erroneous tax figure cannot be escalated or pyramided into fraud, a confraternity of similar errors can take on more sinister tax aspects.

We can indulge in no presumption to penalize even an errant taxpayer, but we do not believe that this tutelage interdicts us to forego ineluctable inferences and common sense. This is not a case of criminal tax fraud where we must be satisfied that guilt was shown "beyond a resonable doubt." Helvering v. Mitchell, 1938, 303 U.S. 391, 397, 58 S.Ct. 630, 82 L.Ed. 917, 920–921; Henry v. C.I.R., 5 Cir. 1966, 362 F.2d 640, 643. We assume that common sense can be the possession of the unsophisticated, the unschooled, and the unlettered. Webb, though not privileged to have the other ingredients, was in possession of common sense. He must have, by the exercise of common sense, known that the figures used in his tax return were serious understatements of his obligations to his government. Innocent falsity is generally improbable; here it is impossible.

Affirmed.