T.C. Memo. 1996-522

UNITED STATES TAX COURT

ERNEST L. AND KATHLEEN NEWSOME, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23323-94.                    Filed November 26, 1996.

James L. Robertson, for petitioners.

Alvin A. Ohm, for respondent.

MEMORANDUM OPINION

CARLUZZO, Special Trial Judge:  This case was heard pursuant
to the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.[1]  Respondent determined deficiencies in petitioners' 1991

_____

    [1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years at issue.  All
Rule references are to the Tax Court Rules of Practice and
Procedure.

and 1992 Federal income taxes in the amounts of $5,256 and $5,169, respectively.

The issue for decision is whether petitioners underreported gross receipts from a newspaper delivery service business conducted by Ernest L. Newsome during 1991 and 1992.

Background

Some of the facts have been stipulated, and they are so found. At the time of the filing of the petition, petitioners resided in Fort Worth, Texas. References to petitioner are to Ernest L. Newsome.

Starting as a child, and for a number of years prior to the years in issue, petitioner had been employed, in various ways, as a newspaper carrier or delivery person. He began delivering newspapers for the Fort Worth Star Telegram (the Star Telegram) sometime in the early 1980's. During the years in issue he delivered newspapers for the Star Telegram on an independent contractor basis. Using the cash receipts and disbursements method of accounting, petitioner reported the income earned and the expenses incurred in the operation of his newspaper delivery service business on Schedules C for the years 1991 and 1992.

During the years in issue, the Star Telegram published morning and evening editions from Monday through Friday, and a single edition on Saturdays and Sundays. Consequently, petitioner delivered newspapers to his customers twice a day during the week and once per day on Saturdays and Sundays.

In 1991 and 1992, the Star Telegram offered 4 basic subscription plans, each having a distinct subscription rate. The subscription rate for daily (the morning or evening edition, Monday through Friday) and weekend (Saturday and Sunday) service was $10.95 per month. The subscription rate for daily service was $8.95 per month. Weekend service, which included Fridays, cost the subscriber $7.95 per month, and a combination service, which included the morning and the evening weekday editions, and the weekend editions, cost $12.95 per month. In addition to these subscription plans, from time to time the Star Telegram offered various discounts and promotions to different categories of subscribers.

Although the subscription rates were set by the Star Telegram, the revenue generated through collections from the subscribers on petitioner's delivery route belonged to him, not the Star Telegram. In effect, petitioner purchased the newspapers from the Star Telegram and in turn sold them to his customers. As best we can determine from the record, a subscriber to the Star Telegram was required to pay on a monthly basis, regardless of the subscription plan. A small percentage of petitioner's customers mailed their payments directly to the Star Telegram, and petitioner received credit for these payments against his liability to the Star Telegram for the cost of the newspapers.

To collect from those customers who did not mail their payments directly to the Star Telegram, petitioner had to go from "door to door", which was a time consuming process. Customers who paid the petitioner in this manner did so by checks made payable to the Star Telegram, or in cash. Petitioner turned the checks over to the Star Telegram, and if his monthly liability to Star Telegram was satisfied, he received a Star Telegram check for the amount turned over. If he had an outstanding liability, the checks he turned over were credited against the liability. Petitioner kept the cash that he collected from his customers in a bag in his house. Petitioner used this cash to pay the balance of his liability to the Star Telegram after payments made by check were taken into account, and for daily operating expenses. Although we cannot estimate the amounts with any degree of precision, it appears that petitioner made substantial cash payments to the Star Telegram each month for the newspapers that he purchased for his delivery route.

Because such a small percentage of petitioner's customers mailed their payments directly to the Star Telegram, and due to the nature of areas that petitioner served, petitioner considered his delivery route relatively undesirable. His route included apartment complexes and trailer parks that had transient populations, and some of the area's less desirable residential neighborhoods.

When petitioner picked up the newspapers from the Star Telegram for delivery, a "draw" sheet was attached to the bundles of newspapers indicating the number of newspapers to be delivered. A "draw" is the number of newspapers petitioner received from the Star Telegram for delivery to subscribers on his delivery route. Normally petitioner was given extra newspapers. Petitioner used the extra newspapers to replace ones that were damaged. In addition to the draw sheets provided to petitioner on a daily basis, each month the Star Telegram provided petitioner with a circulation statement that indicated the number of newspapers petitioner was being charged for, the cost to petitioner of each newspaper, and, after various adjustments,[2] the amount that petitioner owed to the Star Telegram for the newspapers he received during the month. Normally petitioner attempted to satisfy his liability to the Star Telegram by the 15th day of the following month.

Although the circulation statement reflected the number of newspapers charged to petitioner, it did not indicate the number of subscribers, or reflect any information regarding subscription plans. Petitioner had approximately 925 customers in 1991 and

_____

[2]Adjustments were made for refunds, payments from subscribers that were mailed directly to the Star Telegram, surety charges (to insure that petitioner would pay the bill), charge backs for returned checks (regardless of whether they were mailed to the Star Telegram or turned over to the Star Telegram by petitioner), and the application of credits related to special promotions or discounts.

725 in 1992.  Most of petitioner's customers subscribed to either the daily and weekend subscription plan, or the weekend only subscription plan.  About 75 of petitioner's customers subscribed to the combination plan, and about 5 customers subscribed to the weekday only plan.

The Star Telegram provided petitioner with a ledger book that contained 12 receipts (one per month) for each of the subscribers on petitioner's route.  On a weekly basis, the Star Telegram also provided petitioner with a sticker for each subscriber that included the subscriber's name, address, and telephone number, the type of newspaper delivery service, and information regarding discounts.  Once the subscriber paid him, petitioner gave the subscriber a receipt from the ledger. Petitioner used this ledger book to record the payments made by his customers and to keep track of a customer's outstanding liability to him.

From time to time petitioner's customers would move away from his delivery route, cancel their subscription for various reasons, temporarily suspend service for vacations, etc., or fail to pay for the newspapers delivered to them.  In these and similar circumstances, petitioner would turn in a "stop" to the Star Telegram.  The Star Telegram did not process these "stops" efficiently, and there was a time lag between the date that petitioner would turn in a "stop" and the date that the "stop" would be taken into account in petitioner's daily "draw".  When

petitioner turned in a "stop", he turned in the ledger receipts for that subscriber.

During the years in issue, petitioners maintained a joint personal checking account. Petitioner did not maintain a separate account for his newspaper delivery service. During the years 1991 and 1992, petitioners deposited $25,535.97 and $24,030.84, respectively, into the joint account. The sources of the deposits were not specifically identified, but most likely included the net wages earned by Kathleen Newsome during those years, unemployment compensation paid to one or both of the petitioners, and on occasion earnings attributable to one of their children. Checks that petitioner received from the Star Telegram were also deposited into this joint account. Considering the amounts of the specific deposits it appears that few consisted of cash. Petitioner did not make any payments to the Star Telegram with checks drawn on this joint account.

In addition to items not in dispute, the Schedules C relating to petitioner's newspaper delivery service business included with petitioners' 1991 and 1992 Federal income tax returns reflect the following:

|  | 1991 | 1992 |
|---|---|---|
| Gross receipts or sales | $21,000 | $21,500 |
| Cost of goods sold | 3,329 | 2,905 |

Included in the computation of cost of goods sold for each year were amounts for materials, supplies, and labor. No portion of

the cost of goods sold reported for either year included the cost of the newspapers that petitioner purchased from the Star Telegram. Petitioner estimated the amount of gross receipts reported on the Schedules C based upon the checks that he received from the Star Telegram.

Revenue Agent Heidi Wilder (Agent Wilder) conducted the examination of petitioners' 1991 and 1992 Federal income tax returns. Agent Wilder used the actual charges reflected on the monthly circulation statements to determine petitioner's cost of goods sold for 1991 and 1992. Petitioners agree that Agent Wilder accurately calculated the cost of goods sold for each year.

Agent Wilder used other information contained on the statements to calculate petitioner's gross receipts for the years 1991 and 1992. First, she calculated an average evening "draw" number for each month by adding the evening "draw" numbers for Monday through Friday from the circulation statement for that month and dividing that figure by the number of weekday delivery days in the month. She did the same for the morning "draws". Next, Agent Wilder calculated an average Saturday "draw" number for each month by adding the Saturday "draw" numbers and dividing that figure by the number of Saturdays in the month. Agent Wilder then added the average evening "draw" figure to the average morning "draw" figure to obtain an average daily "draw" number. This figure was then subtracted from the average

Saturday "draw" number to obtain the "weekend differential". Next, Agent Wilder multiplied the average daily "draw" number by $10.95 (the daily and weekend rate), and then multiplied the average Saturday "draw" figure, or weekend differential, by $7.95 (the weekend rate). These two figures were added together to obtain the total gross receipts for that month. Agent Wilder completed similar computations for each month for the years in issue in order to estimate gross receipts for each year. Gross receipts for each year were then reduced by 10 percent for uncollectibles. The term "uncollectibles" refers to amounts that could not be collected from subscribers for their newspaper delivery service. The Star Telegram advised Agent Wilder that the uncollectible rate ranged from a low of 5 percent to a high of 10 percent, depending on the nature of the delivery route.

Agent Wilder's method of computing gross receipts did not take into account awards or discounts offered by the Star Telegram. Nor did it take into account the extra newspapers that petitioner had after completing his deliveries. Furthermore, because Agent Wilder did not have access to the ledger sheets, she could not determine the actual numbers of subscribers to the various subscription plans. Consequently, her computations only take into account the two subscription plans to which petitioner's customers most commonly subscribed.

Prior to the examination of petitioners' 1991 and 1992 returns, respondent's agents examined the returns of 200 to 300

newspaper carriers as part of a compliance research project.  In addition, respondent's agents questioned the Star Telegram about how the figures on the monthly circulation statements were calculated.  As a result of these other examinations and the information received from the Star Telegram, respondent developed a ratio between the cost of the newspapers charged to a newspaper carrier and the newspaper carrier's gross receipts.  Agent Wilder checked the accuracy of her estimates in this case against this ratio and found them to be within an acceptable range.

Based upon Agent Wilder's calculations, in the notice of deficiency respondent determined that the gross receipts and cost of goods sold of petitioner's newspaper delivery service were as follows:

|                          | 1991      | 1992     |
|--------------------------|-----------|----------|
| Gross receipts or sales  | $104,929  | $93,323  |
| Cost of goods sold       | 71,288    | 58,848   |

As previously noted, petitioners now agree that the cost of goods sold amounts are accurate.  After taking into account the amounts reported on the Schedules C for these items and an adjustment not in dispute, respondent increased petitioners' income by $14,842 and $14,758 for the years 1991 and 1992, respectively.[3]

---

[3]Due to these changes, respondent increased petitioners' liability for the self-employment tax imposed by sec. 1401 and determined that petitioners were ineligible for the earned income credit.  These adjustments are not in dispute and will be resolved in accordance with the resolution of the disputed issue.

Discussion

Respondent's reconstruction of petitioners' income for each year in the notice of deficiency is presumed correct and the burden is on petitioners to demonstrate otherwise. Rule 142(a); Mallette Bros. Constr. Co. Inc. v. United States, 695 F.2d 145, 148 (5th Cir. 1983).

Petitioners contend that the method by which respondent calculated petitioner's gross receipts is flawed for various reasons. They argue that respondent has overestimated gross receipts because of her failure to take into account: (1) Special discounts and promotions offered by the Star Telegram; (2) the time lag in processing each "stop" resulting in extra newspapers that generated no revenues; and (3) a higher than allowed rate of uncollectibles due to the nature of petitioner's route. Petitioners further argue that respondent's use of only two subscription rates and assumption that each "average" subscriber paid for a full monthly subscription artificially inflates the amount of gross receipts. Lastly, petitioners generally criticize respondent's use of average "draws" arguing that the "draw" numbers regularly fluctuate and do not lend themselves to estimates using averages. In addition, petitioners argue that their modest lifestyle is in accord with their reported income and further demonstrates that respondent's determinations must be erroneous and excessive.

Respondent argues that her estimates are as accurate as possible, given the information that she had at the time. If there are any problems in her estimates, respondent suggests that the problems were caused by petitioner's own record keeping failures. For the following reasons, we agree with respondent.

Taxpayers have the obligation to maintain sufficient books and records in order to allow for the determination of income and expenses, and such books and records are to be kept available for inspection by respondent. Sec. 6001; sec. 1.6001-1(e), Income Tax. Regs. There is some dispute whether petitioners produced any books and records for respondent's review during the examination stage, although we find it unlikely that they did. It is clear, however, that books and records were kept, but for reasons unexplained, petitioners did not produce them at trial. Absent such books and records, we review respondent's method of reconstructing petitioners' income not so much for precision, but for reasonableness under the circumstances. Holland v. United States, 348 U.S. 121 (1954); Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970). Applying this standard of review, none of petitioners' attacks upon respondent's method has merit.[4] While

[4]We disagree with petitioners' contention that regular fluctuations in the number of "draws" renders the use of averages invalid. Petitioners have not called our attention to any statistical principles that support this proposition, and given the intended use of such averages, the opposite seems obvious to us. We also disagree with petitioners' assertion that the rate of uncollectibles respondent used was too low. The amount was the highest rate provided by the Star Telegram. We are also

- 13 -

respondent's method of calculating petitioner's gross receipts may not be perfect, it is certainly reasonable under the circumstances.  As the Court of Appeals for the Fifth Circuit observed in Webb v. Commissioner, 394 F.2d 366, 373 (5th Cir.1968), affg. T.C. Memo. 1966-81:

> Arithmetic precision was originally and exclusively in * * * [the taxpayer's] hands, and he had a statutory duty to provide it.  He did not have to add or subtract; rather, he had simply to keep papers and data for others to mathematicize.  Having defaulted in his duty, he cannot frustrate * * * [respondent's] reasonable attempts by compelling investigation and recomputation under every means of income determination. * * *

In this case, it is obvious that the amounts reported by petitioners for gross receipts and cost of goods sold on the Schedules C were substantially understated.  Had petitioners produced any books and records, we have no doubt that little support would have been provided for the amounts reported on petitioners' Federal income tax returns.  It is also obvious that a significant portion of petitioner's newspaper delivery service business was conducted in cash.  We believe that the gross receipts petitioners reported on the Schedules C failed to take into account considerable amounts of cash payments that petitioner collected from his customers.

---

satisfied that had respondent taken into account petitioners' other concerns, such as the extra newspapers, the fact that 75 of petitioner's customers subscribed to the combination plan, and the fact that 5 of petitioner's customers subscribed to the weekday only subscription plan, only de minimis changes to her estimates would have resulted.

In addition, we find respondent's conclusions supported by the fact that her estimates of petitioner's gross receipts are in line with the results that respondent observed in the examinations of similarly situated taxpayers and supported by information received from the Star Telegram.  We also note that petitioners' incomes as determined in the notice of deficiency are more consistent with the transactions reflected on the records of petitioners' joint checking account than the incomes reported on their Federal income tax returns.

Accordingly, the determinations made by respondent in the notice of deficiency are sustained.

To reflect the foregoing,

Decision will be entered for respondent.