ALVIN HOWSE and JEAN M. HOWSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Howse v. Commissioner
Docket No. 3462-69.
United States Tax Court
T.C. Memo 1974-225; 1974 Tax Ct. Memo LEXIS 89; 33 T.C.M. (CCH) 996; T.C.M. (RIA) 74225; August 29, 1974, Filed. Alvin Howse, pro se. Stanford M. Kaufman, for the petitioner Jean M. Howse. Daniel A. Taylor, Jr., for the respondent. *91 FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Year
Deficiency
Addition to Tax (Sec. 6653(a), I.R.C. 1954) 1964
$ 3,117.39
$155.87
1965
11,458.61
572.93
1966
80.34
4.02
Several concessions having been made, the issues remaining for decision are: 1. Whether respondent could properly reconstruct, by use of the percentage markup method, petitioner's income in 1964 and 1965 from a retail-wholesale merchandising business; 2. Whether petitioners realized additional income in 1964, 1965, and 1966 which they did not report on their income tax returns for those years; 3. Whether petitioners are entitled, under section 165(a), [1] to deduct a confiscation loss for 1965 and, if so, the amount of such loss; 4. Whether petitioners are entitled to a deduction for a net operating loss carryback from 1965 to 1964; 5. Whether any part of the underpayment for each of the years *92 in issue was due to "negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a); and 6. Whether Mrs. Howse is relieved, under the "innocent spouse" provisions of section 6013(e), of liability for the deficiencies and additions to tax. FINDINGS OF FACT Alvin and Jean M. Howse (hereinafter petitioners) were husband and wife and legal residents of El Paso, Texas, at the time they filed their petition herein. Although joint Federal income tax returns were filed for the years in issue and both spouses petitioned this Court, the activities herein described are chiefly those of petitioner Alvin Howse. Accordingly, the term "petitioner" will refer to him individually. Petitioner holds a bachelor's degree in agricultural economics from New Mexico State University and has done one year of graduate work at that institution. On or about July 1, 1964, he started Howse Enterprises (hereinafter Enterprises), a sole proprietorship which he operated until December 1965, at which time he filed a petition in bankruptcy. Petitioners reported income and expenses of Enterprises, based upon a calendar year, accrual method of accounting, on Schedule *93 C of their 1965 joint income tax return. However, petitioners failed to report any profit or loss for Enterprises on their joint return for 1964 even though it had revenues and expenses for that year. Petitioners reported the following income items on their joint income tax returns for the years in issue: Source Year
1964
1965
1966 Wages [1]
$10,156.77
$7,217.32
$11,467.82
Rent
935.00
1,020.00
982.50
Sales
-0-
94,623.69
-0-
$11,091.77
$102,861.01
$12,450.32
Enterprises was a small retail-wholesale sporting goods outlet in El Paso, Texas. Its business premises consisted of a storefront where outboard motors, camping equipment, refrigerators, stoves, washing machines, household items, office machines and supplies, and camera and photo supplies were displayed. In addition, boats were on display in a nearby yard. At the same location was a warehouse, approximately 48 feet by 200 feet, where household appliances were stored. *94 Enterprises also sold merchandise in west Texas, New Mexico, and Mexico at retail and wholesale. In addition to the El Paso store, it rented a "warehouse," consisting of four motel rooms, four garages, and parking space for two trucks, at the Riviera Motel in Juarez, Mexico. Petitioner failed to maintain any books or formal records for Enterprises from which his business transactions could be ascertained. However, the parties have stipulated that Enterprises had no beginning inventory for its taxable year 1964, that the ending inventories for its 1964 and 1965 tax years were $21,362.70 and $10,906.34, respectively, and that during 1964 and 1965, it had ordinary and necessary business expenses of $5,889.73 and $21,964.81, respectively. The following table reflects the amounts of Enterprises' purchases of various kinds of merchandise and the percentage of each category in relation to total purchases: [2] 1964 1965
Amount
%
Amount
% Foods
$ 1,748.63
3.91
$4,985.13
3.85
Camping Equipment
3,196.32
7.15
6,746.52
5.21
Household Appliances & Furniture
17,125.04
38.32
32,155.48
24.85
Marine Supplies
17,541.57
39.25
31,915.90
24.66
Auto Parts & Accessories
1,433.31
3.21
3,170.51
2.45
Fishing Tackle
3,231.44
7.23
13,195.17
10.20
Hardware & Tools
22.48
0.05
15,208.28
11.75
Water Sports Equipment
180.75
0.40
2,227.15
1.72
Guns, Ammunition, & Parts
-0-
-0-
12,392.93
9.58
Office Machines & Supplies
206.75
0.46
1,422.14
1.10
Cameras & Photo Supplies
-0-
-0-
549.00
.042
Golf Equipment
-0-
-0-
343.33$0.27
Clothing
-0-
-0-
3,257.18
2.52
Toys
-0-
-0-
1,626.02
1.26
Game Calls
-0-
-0-
61.58
0.05
Spray Devices
-0-
-0-
142.56
0.11
[1] $44,686.29
99.98
[2] $129,398.88
100.00
*95 On July 26, 1965, Mrs. Howse planned to accompany her husband on a trip to deliver merchandise in Mexico. However, when she arrived at the Riviera Motel in Juarez, where the goods were warehoused, she found officials of the Mexican Government. When petitioner arrived, he spoke with the officials in Spanish regarding the merchandise. This merchandise was inspected and some cartons and boxes were broken open. The merchandise was then confiscated and removed from the motel. Mexican officials prepared a document listing the property seized. The agents detained petitioner but allowed Mrs. Howse to return to El Paso to raise a large sum of money which they requested. She returned to Juarez and went to the customs house, accompanied by her Mexican lawyer, to find that many of the items which had been seized were not there. In addition to the merchandise, petitioner's 1965 International pickup truck, used in transporting and hauling the merchandise, was confiscated, as *96 was a rented trailer which had been towed by the truck. Petitioner claimed that he had purchased the truck in April 1965 for approximately $4,000. Petitioners did not claim a deduction for this confiscation on their joint 1965 return. However, upon being audited by the Internal Revenue Service, petitioners' accountant claimed a confiscation loss of $19,057.26 for 1965. The revenue agent, Henry Doblado (Doblado), allowed only $4,977.87 of this loss, consisting of merchandise having a cost of $1,846.55 [3] and the truck valued at $3,130.32. Since Enterprises lacked both an accounts Totalreceivable ledger and a cash disbursements journal, and in fact had no books or complete records, Doblado determined that Enterprises' records were not adequate to clearly reflect income. Using the specific item method of reconstructing income, he determined that Enterprises had sales of $33,899.63 and $175,267.04 for 1964 and 1965, respectively. Because the period prescribed by the statute of limitations *97 was due to expire shortly, the district conferee recommended that the agent's report be adopted although he had some reservations concerning it, particularly regarding the inclusion of a $32,000 Mexican judgment in Enterprises' 1965 sales. On review it was recommended that the percentage markup method, rather than the specific item method used by the agent, be used to recompute Enterprises' sales, and this was done. Under this method, the alleged judgment was not included in sales. Accordingly, the district conferee computed gross sales for Enterprises, based on cost of goods sold as computed by Doblado, using figures taken from a 1964 and a 1965 "Costs-of-Doing Business Survey" published by the National Sporting Goods Association (NSGA). These surveys showed that, for those NSGA member-retailers participating in the surveys, costs of goods sold represented, on the average, 67.3 percent of net sales in 1964 and 69.7 percent in 1965 and that gross profits for those years constituted 32.7 and 30.3 percent of sales, respectively. [4]
On this basis, respondent determined that Enterprises' sales *98 for 1964 and 1965 were $36,887.49 and $188,566.82, respectively, computed by the percentage markup method and using the NSGA percentages. He also increased petitioners' income for 1966 by $618.73. OPINION 1. Propriety of Percentage Markup Method Each taxpayer is required to * * * maintain such accounting records as will enable him to file a correct return. * * * Accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on his books of account and on his return, * * * Sec. 1.446-1(a) (4), Income Tax Regs. Petitioner exhibited in Court large quantities of papers purportedly representing worksheets, bank transfers, bank deposit and sales slips, etc. However, these papers were disorganized and incomplete, and petitioner had never recorded their essential elements in books of account covering the income and expenses of Enterprises. Neither he nor his accountant could substantiate the figures shown on Schedule C of petitioners' 1965 return. Accordingly, we think respondent was justified in resorting to any reasonable method of income reconstruction which would clearly reflect Enterprises' *99 income. Webb v. Commissioner, 394 F.2d 366, 371-372 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court. The percentage markup method chosen by respondent in reconstructing Enterprises' income consisted of "adding to the cost of goods sold a predetermined percentage of profit." Bernstein v. Commissioner, 267 F.2d 879, 880 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court. This percentage markup method has long been recognized as an acceptable method of income reconstruction. Maurice Cross, 24 B.T.A. 1079, 1082 (1931); Jacob Roffwarg, 2 B.T.A. 332 (1925). 2. Unreported Income for 1964, 1965, and 1966 There is no dispute between the parties as to Enterprises' cost of goods sold. The parties have stipulated the closing inventories for 1964 and 1965 and, consequently, the opening inventory for 1965. In reconstructing Enterprises' income, respondent essentially accepted the amount of purchases determined by petitioner from his suppliers' invoices. As discussed below, respondent adjusted his computation for 1965 for the goods confiscated by the Mexican authorities. We are, therefore, satisfied that the cost-of-goods-sold *100 figures determined by respondent are reasonable. The most serious area of dispute is the percentage markup applied by respondent to the cost of goods sold in computing gross sales. Respondent used the national average percentage markup employed by member-retailers of the National Sporting Goods Association… Petitioner earnestly contends that the national gross profit averages (32.7 percent for 1964 and 30.3 percent for 1965) far exceed the gross profits he realized from Enterprises' retail sales and, further, that a large portion of his sales were wholesale transactions having a much lower markup. Petitioner testified to his approximate markup on various types of goods, but offered no documentation to support his figures. Taking into account all the pertinent evidence, we think the average markup used by members of the National Sporting Goods Association is higher than that used by petitioner. As we understand the record, NSGA's members are sporting goods dealers scattered over the United States who sell at retail. The parties agree that only $14,692.12 of Enterprises' 1965 sales were made at retail rates. A more reliable guide could have been obtained from a similar business *101 of the same relative size and mode of operation, located in petitioner's immediate area. [5] Yet we think petitioner's testimony as to his gross profit was too heavily weighted in his favor. We think it incredible that he would have taken the criminal and other risks he ran in making sales in Mexico for the small margin of profit he claims. To avoid a harsh and unrealistic result, we find, in the light of all the evidence, the applicable percentages to be 25 percent for 1964 and 23 percent for 1965. [6] Based on these percentages, Enterprises had sales of $31,031.60 for 1964 and $161,660.22 for 1965 and net profits of $316.59 and $8,264.34, respectively, for the two years, computed as follows: 1964 1965 Sales
$31,031.60
$161,660.22
less Cost of goods sold:
(24,825.28)
(131,431.07)
Beginning inventory
$ -0-
$ 21,362.70
plus Purchases-Merchandise
46,187.98
122,822.26
less Ending inventory
(21,362.70)
(10,906.34)
Adjustment for confiscation
-0-
(1,847.55)
Gross profit
$ 6,206.32
$ 30,229.15
less Expenses
(5,889.73)
(21,964.81)
Net Profit
$ 316.59
$ 8,264.34
*102 Petitioner reported no income from Enterprises on his 1964 return and his income for that year should be accordingly increased by $316.59. He reported a loss of $28,973.95 from Enterprises on his return for 1965, and we have determined that he realized a profit of $8,264.34. In addition, petitioner has not shown that respondent erred in determining that he omitted an item of $618.73 from his 1966 income. This item was discovered by his accountant during the reconstruction of petitioner's books and records. Petitioner did not object to this item at trial or on brief and has failed to meet his burden of proof as to it. We find no merit in peitioner's claim that this item should be offset by a loss claimed for goods stolen from Enterprises' El Paso store since respondent did not disallow this loss which was claimed on petitioners' 1966 return. 3. Confiscation Loss Petitioner contends that he is entitled to a confiscation loss deduction of $30,052.31 for 1965 representing merchandise with an alleged cost of $27,252.31 and a truck valued at $2,800 [7] seized by Mexican authorities. Petitioner argues that before applying any percentage markup, his purchases for 1965 should *103 be reduced by the cost of merchandise seized. Since this merchandise was not sold, its cost should not be used in computing gross profits for that year. Respondent agrees that an adjustment is in order but does not agree with the amount claimed by petitioner. As noted in our Findings of Fact, the Mexican authorities prepared an inventory of the property seized, and this list was introduced into evidence. Petitioner alleges that this list is incomplete, and he implies that the officials misappropriated a large portion of the merchandise seized and recorded only the remainder. Petitioner's only corroboration was the testimony of Mrs. Howse, who testified that all the property seized was not displayed at the customs house. However, she would not go so far as to state that the officials stole some of the merchandise. She also admitted that some of the property could have been stored at another location. This testimony does not substantiate petitioner's claim. We find the invoices which petitioner *104 presented insufficient to establish an additional loss. Petitioner presented no evidence correlating these "invoices" with the merchandise confiscated. Our study of the documents offered to corroborate this claim, together with all the related testimony, convinces us that respondent did not err to the prejudice of petitioner in computing the amount of this loss. Accordingly, we hold that petitioner has not shown that his confiscation loss exceeded the $4,977.87 deduction already allowed him in the notice of deficiency. 4. Net Operating Loss Carryback Under our Findings, there is no loss to carry back from 1965 to 1964. Furthermore, section 172(b) (2) requires that the entire amount of the net operating loss for any tax year first be carried back to the earliest of the tax years to which such loss may be carried (3 years per section 172(b) (1) (A)), and only the amount by which the loss exceeds the taxable income for each of those prior years may be carried forward. In the instant case, the entire amount of the claimed loss for 1965 would first be carried back to 1962 and then to 1963. However, petitioner has presented no evidence as to his 1962 and 1963 income. For this *105 additional reason, no net operating loss, even if one had been proved, could be carried back to 1964. 5. Additions to Tax Under Section 6653(a) Section 6653(a) provides for the imposition of an addition to the tax if any part of an underpayment "is due to negligence or intentional disregard of rules and regulations (but without intent to defraud)." Respondent's determination that petitioner's underpayment for each of the years in issue was due to negligence or intentional disregard of rules and regulations is prima facie correct. Rule 142, Tax Court Rules of Practice and Procedure. Petitioner presented no evidence to the contrary, and the record amply demonstrates the negligence of petitioner in keeping records for Enterprises. Therefore, the additions to tax on the underpayments for 1964 and 1965 are proper. Mark Bixby, 58 T.C. 757, 791-792 (1972); James S. Reily, 53 T.C. 8, 14 (1969); James W. England, Jr., 34 T.C. 617, 623 (1960). However, the omission of the one item from 1966 income resulted from mere inadvertence rather than negligence. For this reason, we find the addition to tax for that year improper. 6. Mrs. Howse's Liability *106 for Tax and Additions Thereto As a general rule, when a husband and wife file a joint return, each is jointly and severally liable for the tax. Sec. 6013(d) (3). However, section 6013(e) [8] relieves a spouse of liability for taxes, interest, and additions to tax resulting from an omission of income by the other spouse if three requirements are met: (1) the income omitted from the return exceeds 25 percent of the amount of gross income stated in the return; (2) the spouse did not know of, and had no reason to know of, the omission; and (3) the spouse did not benefit from the omitted income. *107 Respondent has conceded that Mrs. Howse is entitled to the benefits of section 6013(e) if the percentage omission test of section 6013(e) (1) (A) is met. Petitioners reported the following amounts of gross income for the years in issue, and we have determined the following omissions from gross income for those years: 1964
1965
1966 Gross income reported:
Wages
[1] $10,156.77
$ 7,217.32
$11,467.82
Rent
935.00
1,020.00
982.50
Sales [2]
-0-
94,623.69
-0-
Total gross income reported
$11,091.77
$102,861.01
$12,450.32
Gross income omitted:
Sales
$31,031.60
$ 67,036.53
$ -0-
Other
-0-
-0-
618.73
Total gross income omitted
$31,031.60
$ 67,036.53
$ 618.73
*108 * * Clearly, the omissions from gross income for 1964 and 1965 exceed 25 percent of the gross income reported for those years. Accordingly, Mrs. Howse is relieved of liability for the taxes, interest, and additions due to Mr. Howse's omissions in those years. To reflect the foregoing and the concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
1. This includes an item of $270 representing reimbursement for travel expenses. ↩
2. These figures were compiled by petitioner from invoices. They do not include items which were paid by check for which no invoice was available. ↩
1. In the statutory notice of deficiency, this figure was increased to $46,187.98.↩
2. In the statutory notice of deficiency, this figure was reduced to $122,822.26 to reflect a confiscation loss adjustment. ↩
3. This amount was based on estimates in pesos by Mexican officials and converted to dollars by the revenue agent. The district conferee reduced cost of goods sold by this amount. ↩
4. The 1964 figures are for retailers having a sales volume of less than $75,000. ↩
5. See Leo J. Omelian, a Memorandum Opinion of this Court dated Mar. 23, 1953. ↩
6. The figure for 1965 is lower than that for 1964 in order to reflect a higher level of wholesale sales by Enterprises and the lower gross profits realized nationally by NSGA members. ↩
7. It appears that petitioner may have recovered this truck since he listed a 1965 International pickup, with $1,600 owing on it, on his bankruptcy petition filed on Dec. 23, 1965. ↩
8. This subsection reads as follows: (e) Spouse Relieved of Liability in Certain Cases. - (e) In general. - Under regulations prescribed by the Secretary or his delegate, if - (A) a joint return has been made under this section for taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (c) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special rules. - For purposes of paragraph (1) - (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted gross income shall be determined in the manner provided by section 6501(e) (1) (A). ↩
1. This includes an item of $270 representing reimbursement for travel expenses. ↩
2. Sec. 6013(e) (2) (B) provides that the amount omitted from gross income "shall be determined in the manner provided by section 6501(e) (1) (A)." Sec. 6501(e) (1) (A) (i) is as follows: In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; * ↩