ARMANDO DiLANDO and JOSEPHINE DiLANDO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Di Lando v. Commissioner
Docket No. 6297-73.
United States Tax Court
T.C. Memo 1975-243; 1975 Tax Ct. Memo LEXIS 129; 34 T.C.M. (CCH) 1046; T.C.M. (RIA) 75243; July 22, 1975, Filed John F. Dargin, Jr., for the petitioners. Justin S. Holden, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax as follows: Addition to tax Year
Deficiency
sec. 6651(a)
sec. 6653(a)
1965 $460 $115 $38
1966
775
194
48
1967
2,162
541
117
1968
12,698
3,175
652
1969
17,072
3,547
887
*130 Following certain concessions by petitioners with respect to the additions to tax, the remaining issues for decision are: (1) The amounts of the gross receipts petitioners received from the operation of their restaurant during the years in issue; (2) the amounts petitioners are entitled to deduct as salaries and wages paid in the operation of their restaurant during the years in issue; (3) whether interest income from certain savings accounts is taxable to petitioners; and (4) whether a rental expense deduction of $3,000 claimed in 1969 by petitioners should be disallowed to the extent of $1,075. FINDINGS OF FACT Certain facts have been stipulated and are found accordingly. Petitioners, Armando and Josephine DiLando, were husband and wife and resided at 55 Vane Street, Revere, Mass., at the time the petition herein was filed. Petitioners filed delinquent joint Federal income tax returns for the taxable years 1965 through 1969 with the director, North Atlantic Service Center, Andover, Mass., on July 20, 1970. Since Josephine DiLando is a party herein only because she signed the returns, we will refer to Armando DiLando as petitioner. During the years at issue, Armando DiLando *131 owned and operated as a sole proprietorship Mondo's Restaurant (hereinafter Mondo's) in the City of Boston, Mass. DiLando acquired this restaurant then located at 17 South Market Street, and began operating it in January 1965. This restaurant had been in operation prior to its acquisition by petitioner. The restaurant was basically a small lunchroom operation, similar to a diner, with a long counter and stools and a few booths and tables. When first acquired by DiLando, the restaurant had been operated from approximately 9:00 P.M. to 8:00 A.M. and served sandwiches and breakfast dishes. Originally, the evening hours were designed to cater to the farmers who would deliver goods to the produce market in the area during the late evening and early morning hours. Initially, petitioner continued to operate with the same evening format; however, gradually, the operation was expanded to 24 hours a day, 6 days a week. Additionally, the menu was eventually increased to include hot meals and a breakfast item named the "farmer's special," consisting of three eggs, with ham, sausage, or bacon, plus home fries, toast, juice and coffee, priced at 99 cents. The "farmer's special" was the principal *132 item sold at the restaurant. When petitioner began his operation, he did not have a following of steady customers. There also existed competition from other restaurants in the area. Eventually, the farmers' market closed, thereby signalling the end of the farmer trade and forcing petitioner to develop a new clientele. Petitioner, however, was able to obtain an alternate customer base as a result of the rapport he established with taxicab drivers who brought late evening customers to Mondo's. Additionally, due to the eccentricity of the operation of Mondo's, i.e., being open 6 days a week and 24 hours a day, the restaurant received a good deal of local publicity. Mondo's became a relatively well-known, late-night spot in the Boston area and petitioner, who had assumed the nickname "Mondo," became somewhat a local celebrity. Petitioner usually stayed at the restaurant 24 hours a day, 6 days a week, returning home only 1 day a week. He slept a few hours at a time in one of the restaurant booths, thus adding to the eccentric atmosphere of the establishment. Mondo's catered to many different types of customers including college students, late-evening "nightclub" people, and the *133 average workingman. The restaurant apparently enjoyed its popularity due, in main part, to its 24-hour continuous service. During the period in question, the majority of the restaurant's business was during the evening hours. Petitioner's business increased steadily during the years at issue reflected by the substantial increases in cost of goods sold each year from 1965 through 1969. Petitioner's income tax returns for 1965 through 1969 showed the cost of goods sold by Mondo's as follows: Cost of Year
Goods Sold
1965
$24,628
1966
31,727
1967
37,644
1968
84,707
1969
97,492 These returns also reflect the cost of the merchandise sold. In the instant situation, the cost of the merchandise is obtained by subtracting from the cost of goods sold for each year the cost of material and supplies for that respective year. The cost of merchandise as reflected on the returns for each year is as follows: Year
Cost of Merchandise
1965
$24,163
1966
31,180
1967
36,515
1968
82,278
1969
94,555 Respondent, in his notice of deficiency sent to petitioner and on brief, used as the cost of goods sold the cost of merchandise as reflected on *134 the returns, with the exception of 1965-where he used $24,628 rather than $24,163. DiLando's returns show the following gross receipts or gross sales for the years in question: Year
Gross Receipts or Sales
1965
$ 41,334
1966
49,917
1967
56,972
1968
110,923
1969
128,143
The reported gross sales for these years exceeded the reported cost of goods by the following percentages: Year
Percentage
1965
40%
1966
36.5%
1967
34%
1968
24%
1969
24% The reported gross sales exceed the reported cost of merchandise by the following percentages: Year
Percentage
1965
42%
1966
38%
1967
36%
1968
26%
1969
26%
The net profits from Mondo's shown on petitioner's returns for the years 1965 though 1969 were as follows: Year
Net Profit
1965
$4,658
1966
2,876
1967
2,672
1968
5,360
1969
6,082
In 1966 DiLando received notification from the Boston Redevelopment Authority that the entire Faneuil Hall Markets area, including the building in which Mondo's was located, was to be the subject of an intensive restoration and rehabilitation program as a result of which petitioner would be required to vacate *135 his then present location. In anticipation of this forced move, DiLando upgraded his food and increased portions, while retaining low prices in order to attract customers. Maintenance of business records and the actual operation of Mondo's was rather informal at best. Petitioner did not maintain business bank accounts during the years at issue. He conducted the business of Mondo's exclusively in cash. Mondo's neither maintained any cash register tapes or receipts nor retained any individual receipts presented to each customer. Such customer receipts were simply disregarded. What records of sales were kept were noted on pieces of paper and placed on a spindle next to the cash register. From time to time these were placed in a large box under petitioner's workbench. Petitioner paid for purchases out of the cash register. Apparently, some sort of records were kept of the purchases because respondent has not questioned the cost of merchandise reported on petitioner's returns and the parties have stipulated that petitioner's "books reflect cost of goods sold approximately as shown on" the tax returns for 1965, 1966, 1967, and 1969. [1]
*136 Because of the location of the restaurant and the unusual hours it was open for business, Mondo's was unable to employ waitresses or other help on a regular basis. Petitioner employed waitresses as he could get them on an hourly basis; he did much of the work himself. Petitioner also employed off-duty policemen from time to time on weekend nights to keep order. He also employed someone to wax the floor of the restaurant about once a week. All of these employees were paid in cash from the cash receipts of the business. Petitioners failed to file income tax returns for the years 1965-1969 when due. Returns for all of those years were filed on July 20, 1970. The only income reported on those returns was from the operation of Mondo's. These returns were filed because petitioner was at that time negotiating for a loan from the Small Business Administration which required copies of his returns for the last 5 years. Petitioner employed an accountant to prepare the returns. The accountant merely entered summary figures for gross receipts given to him by petitioner on the tax returns for the years in issue. The accountant did not perform an independent study to determine what Mondo's gross *137 receipts actually were or what it actually paid for wages or merchandise. On November 12, 1970, when the revenue agent auditing DiLando's returns first contacted him, petitioner informed the agent that he did not have any records of gross receipts or any books or records in general. In 1971, however, a representative of petitioner did show a representative of respondent notebooks purportedly containing the permanent records of Mondo's for 1965-1969. On December 25, 1970, while the restaurant was closed, a waterpipe burst and flooded the premises. In preparation for filing a claim for property lost as a result of the flood, petitioner sent a letter dated January 31, 1971, to his attorney in which he itemized the lost property. Included in the inventory of lost items were "records and papers" valued at $100 by DiLando. On his income tax returns for the years in question, petitioner claimed as business deductions in the operation of Mondo's salaries and wages in the following amounts: Salaries Year
and wages
1965
$ 4,450
1966
7,384
1967
8,268
1968
12,040
1969
14,750
In the notice of deficiency respondent determined that Mondo's had gross receipts *138 in excess of those reported on petitioners' returns as follows: Year
Reported
Increase
1965
$ 41,334
1966
49,917
2,050
1967
56,972
3,886
1968
110,923
26,210
1969
128,143
29,448 The explantion for these adjustments was that in the absence of adequate records the gross receipts were determined by using a percentage markup of purchases as shown on the tax returns. The percentage markup used was 40 percent of the cost of merchandise reported on the returns, which was the approximate markup for 1965 reflected on the return for 1965 filed by petitioners. Respondent also disallowed all or a part of the wages and salaries claimed as business expenses of Mondo's on petitioners' tax returns as follows: Allowed in notice Year
Reported
of deficiency
1965
$ 4,450
$1,625
1966
7,384
4,875
1967
8,268
1968
12,040
1969
14,750 The explanation of these adjustments was that petitioner had not established to whom and in what amounts the claimed salaries were paid in excess of the amounts allowed. OPINION Four issues are left for determination in this case: (1) Whether petitioner understated his gross receipts from Mondo's *139 on his income tax returns for the years in issue; (2) whether petitioner is entitled to deductions for salaries and wages as claimed on these same returns; (3) whether interest income from certain savings bank accounts is properly attributable to petitioner; and (4) whether petitioner's claimed rental expense deduction of $3,000 in 1969 should be disallowed to the extent of $1,075. Petitioner has conceded that his income tax returns in question were filed delinquently without reasonable cause, and that he is, therefore, subject to the additions to tax under section 6651, I.R.C. 1954. [2] Furthermore, petitioner acknowledged that if he did understate his tax liabilities for the years in question, it was due to negligence thereby rendering him subject to an addition to tax under section 6653(a). Issue I
Petitioner owned and operated a restaurant called "Mondo's" during the years in issue. Respondent determined that petitioner underreported his gross sales from the restaurant during these years as follows: Underreported Year
Gross Sales
1965 $
1966
2,050
1967
3,886
1968
26,210
1969
29,448
*140 Respondent alleges that since petitioner failed to maintain any records of gross receipts, an adequate set of books, or bank accounts, respondent was forced to use an indirect method to compute petitioner's actual gross sales and taxable income. Consequently, respondent reconstructed petitioner's income through the method known as the percentage markup method whereby gross sales are determined by adding a predetermined percentage to cost of goods sold. In employing this reconstruction of income method, respondent relied on and accepted the cost of merchandise sold by Mondo's as reflected on petitioner's returns. [3] Respondent concluded that the gross sales for each year should exceed the cost of the merchandise sold by 40 percent. This percentage was arrived at through two independent sources. *141 Respondent's revenue agent looked to a statistical survey prepared by the National Cash Register Co. in support of his 40-percent markup. Respondent alleges that the statistical summary of the operations of the restaurants and specialty food stores considered in this study shows that costs of goods were approximately 60 percent of gross sales, creating a 40-percent markup. The revenue agent also noted that petitioner's 1965 income tax return showed that the gross sales exceeded the cost of goods sold by 40 percent and concluded that this ratio was reasonable. Consequently, the agent added this 40-percent markup to the cost of merchandise sold reported on petitioner's returns for each of the subsequent years in issue to obtain corrected gross sales and thus obtained the unreported gross sales enumerated above. A cornerstone in our system of tax collection is the reliance on the honesty and integrity of the individual taxpayer because the system relies on self-assessment and payment by the taxpayer. In furtherance of this system, certain demands are placed upon the taxpayer, one of which is the requirement that a taxpayer keep such permanent books of account or records as are sufficient *142 to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person on his return. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. If the taxpayer fails in his obligation, the Commissioner may use any reasonable method to compute his income that will clearly reflect his income. Sec. 446. As this Court stated in Harold E. Harbin,40 T.C. 373 (1963) at 377: Thus, where a taxpayer keeps no books or records, or his records are inadequate, the Commissioner is authorized to compute income by whatever method will, in his opinion, clearly reflect the taxpayer's income. No particular method is required since circumstances will vary in individual cases. This rule has been restated on numerous occasions. E.g., Webb v. Commissioner,394 F. 2d 366 (C.A. 5, 1968); Merrittv. Commissioner,301 F. 2d 484 (C.A. 5, 1962); Burka v. Commissioner,179 F. 2d 483 (C.A. 4, 1950). The percentage markup method has been recognized as an appropriate means of reconstructing a taxpayer's income.[4]Bollella v. Commissioner,374 F. 2d 96 (C.A. 6, 1967); Western Supply and Furnace Company v. Commissioner,295 F. 2d 341 *143 (C.A. 7, 1961); Bernstein v. Commissioner,267 F. 2d 879 (C.A. 5, 1959), all affirming Memorandum Opinions of this Court; Hyman B. Stone,22 T.C. 893 (1954). It is not a prerequisite to the use of this method that the Commissioner prove that he is unable to employ another income reconstruction method, such as the net worth method. [5]Bollella v. Commissioner;Bernstein v. Commissioner, both supra.
Petitioner appears to assail respondent's determination with two basic arguments. First, he asserts that his books and records for the years in question were both adequate and accurate and that respondent is, therefore, precluded from reconstructing petitioner's income by an indirect method. Secondly, he claims the respondent's determination, as reflected through the percentage markup method, was arbitrary and unreasonable. Petitioner has the burden of proving both that his books and records would more accurately reflect his income than the method of reconstruction of income *144 used by respondent and that respondent's determination was arbitrary and unreasonable. Harold E. Harbin,supra.Petitioner has failed to do either. The answer to petitioner's first contention is that no books and records of petitioner or Mondo's of any type were offered in evidence or were made available at trial for inspection and the Court has no clear idea of what books and records were actually kept for Mondo's or what they contained. Mondo's had no bank account and its business was conducted with cash. No cash register tapes were kept. Petitioner testified that cash receipts and disbursements were written on small pieces of paper and placed on a spindle; from time to time these would be placed in a box under his workbench and periodically one of the waitresses would take these home with her, total them up, and enter the totals in a notebook. He also testified that when the restaurant was flooded on December 25, 1970, all of these slips were soaked and thrown away. No witness was produced to verify petitioner's testimony about the slips or notebook. The accountant who prepared petitioners' tax returns in July 1970 testified that petitioner brought him a *145 notebook-type book in which there was recorded weekly totals of receipts and expenses and that he prepared the returns solely from the summary figures contained in the notebook or notebooks. This was before the restaurant was flooded and no explanation was given why the accountant did not use the receipts and expenditures slips or that he even verified their existence. The revenue agent who conducted the audit of petitioner's returns asked petitioner for his books and records in November of 1970 and was told that petitioner had none. There is very inconclusive evidence that one or more notebook-type books were presented to agents of respondent sometime in 1971 but the agents testified they contained no record of receipts or income. What happened to these books is also unexplained. At the trial the Court expressed an interest in seeing them but they were not produced. After the trial the parties stipulated that certain books produced by petitioner contained entries reflecting cost of goods sold but there was no stipulation with respect to receipts. We have to assume there were no entries reflecting receipts. In any event the record falls far short of proving that petitioner either *146 maintained or kept records that would clearly reflect either his income or the income of Mondo's. We conclude that respondent was warranted in using the percentage markup of cost of goods sold in computing Mondo's gross sales. Petitioner contends further that the 40-percent markup used by respondent was not realistic; but he offered no reliable evidence of what a realistic markup for this restaurant should be. Respondent purportedly resorted to two sources to arrive at the 40-percent markup figure he used in the notice of deficiency. The first source was petitioner's tax return for 1965 which reflected a markup of approximately 40 percent of the cost of goods sold to arrive at the gross receipts reported on the return. The second source was a statistical report published by the National Cash Register Co. on the expenses of various types of retail businesses compiled from various extraneous sources. The statistics relied on were Summary Profit and Loss Statements of Restaurant Operations for 1965 and 1966 where food only was served and where both food and beverages were served, and a special category designated "Specialty Food Stores (Delicatessen, etc.)." In each table the cost of *147 sales did not exceed 60 percent of gross sales. At the trial respondent also introduced in evidence, over petitioner's objections, excerpts from publications of the United States Treasury Department, Internal Revenue Service, entitled Statistics of Income taken from business income tax returns of selected businesses operated as proprietorships for each of the years in issue. These purported to reflect, among other things, the business receipts and cost of goods sold of a number of busineses designated as "eating and drinking places" or "eating places." The markup of cost of goods sold in these reports averaged over 40 percent for that type of business. We recognize that the statistical evidence offered by respondent may be unreliable for purposes of determining the proper markup of cost of goods sold to apply to Mondo's to arrive at gross sales. We have no knowledge whether the businesses used in the reports were at all comparable to Mondo's. [6] However, such evidence can be useful to the Court in determining whether its own calculations, based on what other evidence is available, are too far out of line, and that is all we have used such evidence for. *148 Respondent also relied on the 40-percent markup figure reflected on petitioner's return for 1965 in determining what markup to use. It is certainly permissible for respondent to employ such evidence, Hyman B. Stone,supra;MelvinE. Tunningley,22 T.C. 1108 (1954); and it is not without rational foundation in this case. The year 1965 was DiLando's first year of operation of the restaurant, and he was faced with competition from other restaurants in the area. Initially the restaurant was not open 24 hours a day and petitioner testified that he relied primarily on what he claims was a low-profit item, his "farmer's special." But despite these facts the gross sales reflected on his 1965 return exceeded his cost of goods sold by 40 percent, in his first year of business. And it is obvious from a comparison of petitioner's cost of goods sold in the earlier years of his operation with his cost of goods sold in 1968 and 1969 that the volume of Mondo's business increased rather dramatically. So respondent was not arbitrary or unreasonable in choosing the 40-percent markup as a starting point. Nevertheless, we believe certain adjustments should *149 be made in respondent's determinations for the years 1966-1969 because of the changing circumstances. The area in which Mondo's was located was scheduled for redevelopment and restoration and the markets which produced many of Mondo's customers moved away. Petitioner was able to attract new types of customers but in order to do so he had to upgrade his merchandise but keep his prices about the same. He apparently continued to sell his breakfast special for 99 cents despite the rising cost of its ingredients, thus decreasing his margin of profit. It is also probable that petitioner fed more "free loaders" in the later years than he did in the earlier years. Specific evidence is completely lacking from which we can determine the precise margin of gross profit petitioner realized during the years in question. However, there is enough evidence to convince us that respondent's 40-percent markup should be decreased in the later years. We have done the best we can with the evidence at hand to determine the proper markup to use, bearing heavily against petitioner whose inexactitude precipitated this situation. Cohan v.Commissioner,39 F. 2d 540 (C.A. 2, 1930). We accept *150 as reasonable the figures contained on petitioner's 1966 and 1967 returns. Those figures reflect percentage markups of 38 percent and 36 percent, respectively. But we find the percentage markup reflected on petitioner's 1968 and 1969 returns to be unrealistic. We believe that a markup of 35 percent for those years is more realistic and hold accordingly. Issue II
During the years at issue petitioner claimed deductions for salaries and wages paid to employees in the following amounts: Salaries and Year
Wages
1965
$ 4,450
1966
7,384
1967
8,268
1968
12,040
1969
14,750 Respondent disallowed the following portions of these deductions: Year
Amount Disallowed
1965
$ 2,825
1966
2,509
1967
8,268
1968
12,040
1969
14,750 The reason stated in the notice of deficiency was that petitioner failed to substantiate deductions in excess of those allowed. Although the petitioner was extremely lax in his presentation of evidence to substantiate these deductions, we believe the evidence does demonstrate that Mondo's did have some employees in each of theyears in issue and that it would be unrealistic not to allow a reasonable allowance *151 for wages paid in each year. Admittedly, DiLando did not help his cause by failing to maintain competent employee records. The piece of paper introduced at trial which allegedly contained a listing of the first names of former employees based on DiLando's memory just prior to trial is of no probative value. Similarly, petitioner's uncorroborated testimony purportedly establishing that during the years in issue he employed a police detail for two nights each weekend at a cost of $20 per night and a floor waxer at a cost of $15 per week in 1965 and 1966 and $20 per week in 1967, 1968, and 1969 is of little aid to his position. Petitioner should have attempted to produce some former employees as witnesses. He did state that he still employs the same floor waxer, yet, he made no attempt to produce him at trial. Nevertheless, in spite of the obvious flaws in petitioner's evidentiary presentation, we are convinced from petitioner's own testimony plus the testimony of other witnesses that petitioner did have some employees during all the years in question. Again, we find it necessary to utilize the rule established in Cohan v. Commissioner,supra.
Respondent has conceded *152 that Mondo's had some compensated employees in 1965 and 1966 through the allowance of a portion of the deduction claimed for salaries and wages for those years. The record does not make clear how respondent arrived at the amounts allowed except a vague reference to amounts reflected on "941's" [7] filed by petitioner. Respondent allowed no duduction for salaries and wages for the years 1967, 1968, and 1969. It seems logical to conclude that if Mondo's employed waitresses in 1965 and 1966 it would have employed additional waitresses in subsequent years as its volume of business increased rather dramatically. In our judgment, based on all the evidence presented, it is reasonable to assume that Mondo's paid wages to employees of not less than $3,120 in 1965, $4,990 in 1966, $6,240 in 1967, $8,140 in 1968, and $9,120 in 1969, and that petitioner is entitled to deductions in those amounts for those years. We so hold. Our conclusion with respect to wages takes into consideration, among other things, the following facts which we deemed to be reasonably well established by the *153 evidence. Petitioner was a rather unique proprietor of this restaurant in that he spent most of his time in the restaurant while it was open and did much of the work himself; because of the hours the restaurant was open, petitioner could not employ help on a regular basis but employed waitresses on an hourly basis as he could get them; petitioner could not have operated the restaurant alone without some help most of the time but probably did not need more than one helper at a time; during 1965 the restaurant was open approximately 12 hours a day, but this increased gradually to a full 24-hours-a-day, 6-days-a-week schedule over the ensuing years; petitioner paid the employees $1 per hour at first, but this was increased to $1.25 per hour in the later years; petitioner did employ someone to clean the restaurant on occasions and as the volume of business increased did employ off-duty policemen to keep order at times; and petitioner paid the more or less itinerant waitresses, cleaner, and policemen in cash, kept no accurate records of the amounts so paid out, and did not withhold income tax from the wages he paid them. [8]
*154 Seldom have we been at more of a loss to determine with any assurance of exactitude the correct taxable income of a taxpayer than in this case, but the fault lies with the petitioner who might have avoided this situation had he kept adequate records and filed his returns on time. [9]
Issue III
Respondent determined in the notice of deficiency that petitioner failed to report interest income from certain savings accounts in the amounts of $165, $531, $311.89, $352.15, and $390 for the years 1965, 1966, 1967, 1968, and 1969, respectively. Petitioner claims that the accounts which generated this interest were established for his sons in their names. He failed to produce any concrete evidence to support his assertion. Consequently, we find that the petitioner has failed to carry his burden of proof on this issue. Rule 142(a), Tax Court Rules of *155 Practice and Procedure.
Issue IV
Petitioner claimed a deduction for rental expenses for his business property in the amount of $3,000 in 1969. Respondent disallowed the deduction to the extent of $1,075. Respondent's revenue agent testified that he contacted petitioner's landlord, the Boston Redevelopment Authority, and learned that in 1969 petitioner had not paid his rent to the extent of $1,075. Since petitioner was a cash basis taxpayer, the agent concluded that he was not entitled to deduct this unpaid portion of his rent. Petitioner simply testified that he believed that he paid $3,000 in rent in 1969. He failed to substantiate this claim through the introduction of any additional evidence. The taxpayer did not sustain his burden of proof on this issue. Decision will be enteredunder Rule 155.
Footnotes
1. No records of petitioner were offered in evidence or were available for inspection at the trial. At the Court's request the record was kept open to receive a stipulation from the parties either of whatever records petitioner could produce or what relevant evidence such records revealed. The stipulation recited above is all that was received. We assume the year 1968 was left out of the stipulation for reason.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
3. As we noted in our findings of fact, respondent, in reconstructing petitioner's income, used as the cost of goods sold the cost of merchandise, as reflected on petitioner's returns, with the exception of 1965. For 1965, respondent used the higher amount actually shown on the return as cost of goods sold, i.e., $24,628. Using this figure for 1965, respondent apparently determined that petitioner's gross receipts exceeded his cost of goods sold by 40 percent. He then applied this 40 percent markup to the other years in question basing his computations on the lower figures which represent the cost of merchandise sold. The use of these lower figures by respondent is basically favorable to petitioner and we shall, therefore, treat respondent's assumptions as concessions by him in making our own determination.↩
4. See Alvin Howse,T.C. Memo. 1974-225; Robert Wright,T.C. Memo. 1967-86↩. 5. ee Bolen Webb,T.C. Memo. 1966-81↩
6. See Alvin Howse,supra;Leo J. Omelian,↩ a Memorandum Opinion of this Court dated March 23, 1953.
7. We assume this refers to T.D. Form 941, Employer's guarterly Federal tax return of income tax withheld.↩
8. The revenue agent testified that he disallowed all wages not reported on withholding tax forms or otherwise substantiated because he felt petitioner would be liable for the withholding tax anyway. The latter may be true but that is not the question before us.↩
9. We might well have decided this case consistent with respondent's determination in the notice of deficiency because petitioner failed to produce sufficient specific evidence to prove wherein respondent's determination was in error. However, the circumstantial evidence produced convinces us that it would be unreasonable to do so.↩