ROBERT BOROWIECKI and JUNE BOROWIECKI, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
Borowiecki v. Commissioner
Docket No. 14062-83.
United States Tax Court
T.C. Memo 1987-23; 1987 Tax Ct. Memo LEXIS 23; 52 T.C.M. (CCH) 1366; T.C.M. (RIA) 87023; January 12, 1987. Lawrence J. Lee, for the petitioners. Terence D. Woolston, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined that petitioners were subject to an addition to tax under section 6653(b)[1] in the amount of $5,437.01 for their 1978 taxable year. *24 The only issue for decision is whether petitioners are liable for such addition to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found.The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in the State of Arizona at the time of the filing their petition. Petitioners were husband and wife at all times relevant to this case. Petitioners prepared their 1978 Federal income tax return using the cash receipts and disbursements method of accounting. Petitioners Robert Borowiecki (Robert) and June Borowiecki (June) were lessees under a master lease on a complex of shops in Scottsdale, Arizona from 1971 through 1978. Robert and June leased out individual shops and/or space to various entities under the business name of "Aunt Hattie's." June was also a full time employee of Mountain Bell in 1978. In addition, to playing the role of landlord for Aunt Hattie's, Robert ran a gift shop called "Sandstones." June maintained the books and records for Aunt Hattie's and Sandstones. The rent due from petitioners on the master lease during 1978 was $2,383 per month. From early 1976 through February 1978, *25 one of the major tenants of Aunt Hattie's was a restaurant named "La Crepe." The restaurant was operated by Golden Triad, Inc. (Golden Triad), whose principals were the Friedmans. Both prior to and during the time that the La Crepe restaurant operated, the Friedmans were required to make substantial alterations and improvements to the space by the City of Scottsdale to make it suitable for the operation of a restaurant. The monthly rent which La Crepe paid to petitioners was $1,900. In February of 1978, the Friedmans notified Robert that La Crepe/Golden Triad would not pay the required rent in the future. On March 30, 1978, Golden Triad filed a petition for bankruptcy. Golden Triad did not pay rent to petitioners for February and March of 1978. When Golden Triad signed the lease with petitioners, it made an $11,400 security deposit under the terms of the lease. When Golden Triad filed for bankruptcy, Robert prepared a list of expenses for his attorney which he felt were an offset against the security deposit. Robert believed that these items of expense and lost income offset all income from 1976, when the lease with Golden Triad was signed, through the conclusion of the bankruptcy. *26 The list of expenses and lost income prepared by Robert consisted of the following items: Item
Amount
Feb. 1978 Rent (La Crepe)
$1,900.00
March 1978 Rent (La Crepe)
1,900.00
April 1978 Rent (La Crepe)
1,900.00
May 1978 Rent (La Crepe) (1/2 month)
950.00
City of Scottsdale
Sewer and Trash Lien
149.72
Lawyers' Fees
140.00
Lawyers' Fees for Lease
320.00
Yearly Increase in Insurance
372.32
Tax Increase on Property
372.10
Newspaper Ads Regarding Lease
(2 X $8.66)
17.32
Village Locksmith
($57.12 + $15.00)
72.12
Copies of Lease
3.36
Alarm
40.00
Roof Repair
300.00
Film Development
6.00
Loss of Lease Commission
3,420.00
Clean-up Time (2 days, 2 people)
?    $11,862.94
After litigation between the Friedmans and petitioners, [2] the bankruptcy court allowed and disallowed petitioners' claimed losses and expenses as an offset against the security deposit as follows: Item
Claimed
Allowed
Disallowed
Rental from 4/23/76
through 5/1/76
$ 405.36
$ 405.36
Rental for 2/78 and 3/78
3,800.00
3,800.00
Real estate tax
reimbursement
699.39
372.10
$ 327.29
Insurance reimbursement
372.32
372.32
Lease xeroxing
3.26
3.26
Appraisal of equipment
35.00
35.00
Lien payment to City of
Scottsdale
149.72
149.72
Repair to security alarm
40.00
40.00
Locksmith
72.12
72.12
Newspaper ads
17.32
17.32
Roof repair
300.00
300.00
Development of film
6.00
3.00
3.00
Refrigeration service
23.00
23.00
General cleanup
200.00
200.00
Attorneys' fees
2,500.00
2,500.00
Loss of lease commission
3,420.00
3,420.00
$12,043.49
$5,282.22
$6,761.27
*27 When petitioners regained control of the La Crepe restaurant space, all of the alterations and improvements made by Golden Triad reverted to petitioners. Petitioners began negotiations to lease the La Crepe restaurant space to JFK Corporation (JFK) after Golden Triad's default and bankruptcy. Frances Daly (Daly), president of JFK, paid Robert $5,000 as a lease deposit on March 14, 1978. On March 24, 1978, petitioners received $50,000 from Daly, on behalf of JFK, for the La Crepe restaurant space. The $5,000 lease deposit paid to Robert was in addition to the $50,000 payment. The $5,000 lease deposit was deposited in Aunt Hattie's checking account shortly after it was received. Daly also paid a damage deposit of $4,100, which was equal to the first and last months' rent under the lease. Of the $50,000 paid by JFK, $49,000 was a turnkey lease payment for the privilege of using the restaurant facilities at the La Crepe site. A turnkey is an arrangement under which a contracting party develops or provides a building which is completely ready for occupancy or operation. Petitioners signed *28 a new lease for the La Crepe restaurant space with JFK on or about March of 1978. Rather than being deposited in a business bank account, the $50,000 payment was deposited in a new personal savings account in the name of petitioners. [3] Petitioners did not report the amount on their Federal income tax returns for 1978. In June of 1979, JFK also declared bankruptcy. A revenue agent began an examination of petitioners when he discovered that a $50,000 check had been written to them by Daly, whom he was auditing at the time. The revenue agent's first contact with petitioners occurred when he telephoned June in early November 1980. During this conversation, the revenue agent asked June if the $50,000 payment had been reported on petitioners' 1978 income tax return, and June responded that it *29 had been. The revenue agent then asked June to send him copies of their 1977 and 1978 returns. The revenue agent received the returns on November 25, 1980. When the revenue agent reviewed the returns, he concluded that the $50,000 had not been reported because the gross receipts from the business remained consistent over the years. The revenue agent contacted June by telephone on November 26, 1980, and again asked if the $50,000 had been reported. June replied that it had not been reported because of offsetting losses. The revenue agent met with June on January 21, 1981, during which meeting she told the revenue agent that she did all the bookkeeping for Aunt Hattie's. During this meeting, they reviewed the records of the savings account in which the $50,000 payment had been deposited and discussed the withdrawals from the account and the usages to which the money had been applied. From the saving account records and the discussion with June regarding the savings account withdrawals, the revenue agent later prepared a summary of expenditures. The revenue agent asked June whether she had discussed the receipt of the $50,000 with an accountant and she replied that she had *30 not. The revenue agent met with petitioners on April 2, 1981, to discuss the inclusion of the $50,000 in income and to discuss the addition to tax for civil fraud. Both petitioners stated that they did not view the $50,000 as income because losses from the bankruptcies, lack of rentals through vacancies, and expenses incurred in connection with Aunt Hattie's were an offset to the income. Robert stated that he had worked for 10 years as a pauper and they deserved to treat the $50,000 as a gift to themselves, and that after 2 bankruptcies they deserved to get away and did so. During this conference, petitioners signed an agreement to include the $50,000 in their income for 1978. After the conference, June wrote a rebuttal, dated May 12, 1981, to the revenue agent's summary of what had transpired at the meeting. June's rebuttal stated that: (1) petitioners now know that the $50,000 should have been reported and agree that the tax is due; (2) Robert's statement that he had worked 10 years as a pauper and that they deserved to get away after 2 bankruptcies and did so, was made in connection with a discussion regarding vacations to Hawaii and getting away on those vacations; and *31 (3) the statement that petitioners treated the $50,000 as a gift to themselves was made in the context that petitioners now know that they owe the tax but at the time felt that the income was offset by losses incurred because of the bankruptcies. In the rebuttal, June listed expenses which she had felt would offset the $50,000 in income. These expenses included real estate fees, rental vacancies, relocating costs of other tenants, securing the building-locksmith, attorneys' fees, court costs, security deposits, city debts owed, storage of court secured items, and equipment judgments. June stated that she felt that the offset of expenses and loss of income through rental vacancies continued from 1978 through and including the bankruptcy which concluded in 1982. After the April 1981 conference, petitioners retained an accountant, Robert B. Semans (Semans), who filed an amended Federal income tax return for petitioners' 1978 tax year on August 17, 1981. The revenue agent met with Semans on November 17, 1981, regarding the audit of the 1978 income tax return. During this conference, Semans told the revenue agent that June had informed him that she had discussed the $50,000 payment *32 with Arnold Burr (Burr), a tax preparer who had prepared the 1978 return. Semans also stated that June had told him that Burr had advised her not to report the $50,000. On November 19, 1981, the revenue agent telephoned June and verified that she had discussed the $50,000 turnkey lease payment with Burr and that Burr had advised her not to report the $50,000 as income. Semans had been hired by petitioners to review the Internal Revenue Service audit report regarding the 1978 proposed tax and additions to tax. Semans' accounting activities with respect to the 1978 income tax audit of petitioners consisted of reviewing the revenue agent's report and petitioners' income tax return for 1978. Semans knew that the addition to tax for civil fraud was being proposed by the Internal Revenue Service as a part of the audit findings. Semans did not review the books, records, or bank statements of petitioners in preparing the amended Federal return for 1978. The cash basis books and records of Aunt Hattie's for 1978 prepared by June list the checks on a month by month basis. June categorized certain checks written on Aunt Hattie's account during 1978 as "draws." A partial listing of these *33 types of checks includes: Date
Payee
Designation
Amount
1/23/78
Frame Game
Cash Draw
$209.74
1/27/78
A & D Auction
Cash Draw
150.00
4/13/78
Ace Mirrors
Cash Draw
770.70
4/20/78
Sea of Tranquility
Draw
15.00
5/10/78
Frame Game
Draw
7.56
5/10/78
Country Roads
Draw
50.40
7/17/78
Stitching Post
Cash Draw
49.42
10/23/78
Snap Stop
Cash Draw
64.21
June summarized the individual checks appearing in the books and records into monthly and yearly totals of expense during her vacation time from Mountain Bell. The yearly expense totals were carried from the books and records prepared by June to the Schedule C for Aunt Hattie's attached to petitioners' income tax return for 1978, which was prepared by Burr. Burr prepared petitioners' income tax returns for a number of years, including 1978. Burr did not generally prepare the books and records of a client when he prepared an income tax return. Burr normally prepared returns from summary sheets on which the client had compiled the information necessary to prepare a tax return. In accordance with Burr's normal practice, June brought summary sheets of information to him with *34 income and expense information to enable Burr to prepare petitioners' returns. All of the information that Burr used to prepare the tax returns for petitioners came from the summary sheets. Robert did not accompany June to Burr's office when Burr was preparing petitioners' tax returns. OPINION The only issue for decision is whether petitioners are liable for an addition to tax under section 6653(b) for their taxable year 1978. Section 6653(b) imposes an addition to tax if any part of an underpayment of tax is due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent must show that the taxpayer intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The elements *35 to be established are (1) an underpayment of tax, [4] and (2) that some part of this underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972). Petitioners have admitted that they wrongly failed to include the $50,000 payment from JFK in income in 1978 and that an underpayment resulted. Our inquiry is, therefore, narrowed to determining whether the underpayment resulted from a fraudulent intent on the part of petitioners. The existence of fraud is a factual question to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976) affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available, and the *36 taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. Respondent contends that petitioners' fraudulent intent is clearly demonstrated by their failure to report the $50,000 payment in combination with alleged inconsistent statements made by petitioners to respondent's revenue agents and at trial. Respondent admits that the mere understatement of income standing alone is not sufficient to prove fraud. See Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Further, this case does not involve the consistent underreporting of income for a number of years. See Marcus v. Commissioner,supra at 577; Otsuki v. Commissioner,supra at 107-108. Respondent first directs our attention to June's inconsistent statements made to the revenue agent regarding whether the $50,000 payment had been reported. When *37 the revenue agent initially contacted June, she told him that the $50,000 payment had been reported on their 1978 return. The revenue agent's telephone call came without warning approximately one and one-half years after the return had been prepared and approximately two and one-half years after the payment had been received. Further, upon the revenue agent's request, June promptly sent him copies of their 1977 and 1978 returns. From these returns, the revenue agent readily determined that the payment had not been reported. When the revenue agent next called June, she admitted that the payment had not been reported and attempted to explain that they believed that the amount had been offset by losses incurred on the bankruptcy of their tenants. Following this conversation, June meet with the revenue agent for the first time, at which time she provided him with the records of the savings account in which the money had been deposited. Under the instant circumstances, June's statement to the revenue agent that the payment had been reported does not seem indicative of a fraudulent intent. The statement was made without time for her to refresh her memory and she readily provided the *38 information necessary to support or dispel the truth of the statement. Respondent contends that the existence of fraud is evidenced by petitioners' inconsistent assertions as to why the $50,000 payment was not reported.Respondent argues that petitioners alternately claimed that the amount was not reported because of offsetting losses or that the amount was not reported on the advice of Burr. From the record, it appears to us that petitioners consistently asserted their claim that they believed offsetting losses made the reporting of the payment unnecessary. Petitioners continued to make this assertion even after they had told respondent's revenue agent that Burr had advised them not to report the amount. Respondent also contends that petitioners' failure to inform the revenue agent of having allegedly received advice from Burr for nearly a year after the auditing process had began is indicative of fraud. Petitioners claim that Burr had advised them not to mention his involvement during the audit. Petitioners' testimony and Burr's testimony conflicted as to both this point and as to Burr having advised them not to report the amount. Seman's testimony supported the consistency *39 of petitioners' position. Further, we find Burr's tesimony to have been evasive and completely lacking in credibility. [5]
Respondent asserts that June could not have believed in good faith that losses from the bankruptcy of Golden Triad offset the payment received from JFK because such losses were not large enough to cover the payment and because some of these losses were either claimed as an offset to Golden Triad's security deposit in the bankruptcy proceeding or were claimed as losses on petitioners' income tax return. Petitioners' losses which would result from the bankruptcy of Golden Triad were not known to petitioners at the time of the preparation of their 1978 return. The bankruptcy dispute with Golden Triad was not resolved until *40 mid-1980. Respondent is, however, correct in his contention that some of the alleged expenses resulting from the Golden Triad bankruptcy were claimed as losses on petitioners' 1978 return. Respondent argues that June's understanding of bookkeeping was too sophisticated for her not to have known which expenses from her summary sheets would be claimed as deductions on their 1978 return. Respondent also argues that June and Robert knew enough about Federal income taxation that they could not have believed that their potential losses could be used to offset their present income. However, the taxation of payments resulting from property and business dealings is often not a simple matter. Respondent has not shown that petitioners had sufficient knowledge with respect to such matters. [6]
*41 Respondent has failed to demonstrate that petitioners' failure to report the $50,000 resulted from a fraudulent intent on their part. Accordingly, we find that petitioners are not subject to an addition to tax under section 6653(b) for their 1978 taxable year. Decision will be entered for the petitioners.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The litigation between the Friedmans and petitioners ended around June of 1980.↩
3. Aunt Hattie's did not have an interest bearing business savings account, it had only a business checking account. The name listed on the account in which the $50,000 was deposited was originally that of petitioners. On the advice of Arnold Burr, their return preparer, the name was later changed to that of their son.The parties, however, have attached little relevance to this fact.↩
4. As relevant to this case, section 6653(c)(1) defines "underpayment" for purposes of section 6653↩ as a "deficiency" as defined in section 6211.
5. While testifying, Burr claimed to remember that he had not given petitioners any such advice but was unable to remember almost any other relevant fact from the year in issue, including whether his accounting service had employed anyone other than him and his wife. Burr's lack of memory seemed to extend to anything that did not directly relate to his culpability in the matter. We find his evasiveness to be suggestive of culpability.↩
6. While petitioners have clearly had some exposure to dealings in business and property, the record demonstrates that petitioners had little involvement in tax related matters. June used her vacation time from Mountain Bell to prepare the year's summary sheets for Aunt Hattie's from which their tax returns were prepared by Burr. The books of Aunt Hattie's from which the summary sheets were prepared showed all of the expenses paid from Aunt Hattie's checking account and listed those of a personal nature as "draws." These books fail to demonstrate a sophisticated knowledge of accounting or any knowledge of tax accounting beyond an elementary awareness of the difference between personal and business expenses. There is no evidence in the record that petitioners involved themselves in tax matters beyond the scope of providing Burr with the summary sheets.↩