T.C. Memo. 1997-30


UNITED STATES TAX COURT


HENRY HARDY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13458-93.                    Filed January 16, 1997.


Henry Hardy, pro se.

Linette B. Angelastro and Michelle Or, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Chief Judge: Respondent determined deficiencies in, an addition to, and a penalty on, petitioner's Federal income taxes as follows:

| Year | Deficiency | Addition to Tax and Penalty Sec. 6653(b) | Sec. 6663 |
|------|-----------|------|------|
| 1988 | $16,590 | $11,387 | --- |
| 1989 | 37,184 | --- | $26,523 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether petitioner had unreported income in 1988 and 1989; (2) whether petitioner is liable for the addition to tax and penalty for fraud in 1988 and 1989, respectively, or, in the alternative, liable for the addition to tax and penalty for negligence; and (3) whether the period of limitations for assessment is open for 1988 under section 6501(c)(1) or, in the alternative, open under section 6501(e)(1)(A).

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Included among the stipulated exhibits is the transcript of petitioner's criminal trial. At the time the petition was filed, petitioner was incarcerated at the California Correctional Institution in Tehachipi, California.

Petitioner started a business known as the Stardust Modeling Agency (Stardust) in 1987. Petitioner opened a bank account for Stardust, purchased furniture for Stardust, and signed the lease for Stardust. Petitioner operated Stardust from the end of 1987 into mid-1991. The hours of operation of Stardust were Monday through Saturday, 10 a.m. to 10 p.m. During 1988 and 1989,

Stardust employed approximately 10 women (the models).  The business of Stardust was conducted out of an office and "studios".  When the business began, there was one studio.  Petitioner eventually added two studios for a total of three studios where the models could perform at Stardust.

The business of Stardust consisted of customers paying for the models to engage in various acts.  The customers either called Stardust and scheduled an appointment or walked in off the street.  The models' acts included dancing seminude to nude, modeling for pictures, and engaging in various sexual acts, including intercourse.  During 1988 and until approximately August 1989, petitioner charged $80 for a model to spend a half-hour session at a Stardust studio with a customer.  In August 1989, the half-hour rate increased to $100 per session.  The models received $30 of the fee paid to Stardust and any tip made at the discretion of the customer.  The models often gave to petitioner a percentage of their tips.  Stardust offered 1-hour sessions at Stardust for $180.  Stardust also offered "outcalls" for $200, where the models were taken to a different location, such as a hotel, for a session with a customer.

Stardust kept records of the models' sessions on log sheets.  The original log sheets were filled out contemporaneously as customers arrived at Stardust.  The models would record information about the session on the log sheet.  The information included the date, time in/out, and type of session (modeling or

outcall), along with the price, the model's name, and comments. The comments consisted of the customer's first name and occupation, although this information was based on conversations with the customers and was not verified. Additionally, the amount of tip a model received was recorded next to her name with a circle around the amount. The original log sheets were written in different color inks, with different penmanship, and the times of the sessions varied throughout the day.

The models received the cash fee for the session prior to the start of the session. Stardust did not take checks or credit cards. The cash was placed inside of a book in the office and was later removed by petitioner. Sometimes the models would be paid their percentage with the money in the book right after a session ended.

Petitioner was not at Stardust during all of its hours of operation. He was concerned about the models' performing sessions without his knowledge and keeping the fees. To prevent a loss of fees, petitioner installed video cameras in strategic locations at Stardust. He told the models that the cameras recorded every customer that came into Stardust and that he reviewed the videotapes. In actuality, the video cameras worked as surveillance cameras but were not connected to a recording device.

Petitioner was also concerned about privacy. He instructed the models not to talk to anyone outside the business about the

business and, particularly, not to mention his name in association with the business.

Okema Wells (Wells) assisted petitioner with the management of Stardust from its inception. Wells was a friend of petitioner. In 1989, she also began modeling for Stardust. Petitioner instructed Wells to recreate the Stardust daily logs by hand for 1988 and 1989. The 1988 logs were recreated in 1989, and the 1989 logs were recreated in 1990. The log recreated for 1988 listed the time that every session occurred during the year as "9:00-9:30", "3:00-3:30", or "6:00-6:30". All of the sessions were listed as half-hour sessions, and there were no outcalls. The log recreated for 1989 listed various times for the sessions but omitted the comments. For 1989, all of the sessions were recorded as half-hour sessions with the exception of two 1-hour sessions in June. Neither the log recreated for 1988 nor the log recreated for 1989 contained any record of a tip next to the models' names.

Petitioner timely filed Forms 1040, U.S. Individual Income Tax Returns, for the taxable years ended December 31, 1988, and December 31, 1989. Petitioner claimed married filing separate as his filing status on the 1988 and 1989 returns. He reported his adjusted gross income as $1,193 and $9,123 for 1988 and 1989, respectively. Petitioner received $7,920 in April 1988 as a settlement on an insurance claim. Petitioner filed his Form 1040 for 1990 in October 1991. Petitioner claimed married filing

separate as his filing status on his 1990 return and reported his adjusted gross income as $77,814. Petitioner's 1988 and 1989 returns were prepared by H&R Block. Petitioner provided the preparer with amounts to be used on the returns for income and expense, but he did not supply any supporting documentation.

Petitioner's 1988, 1989, and 1990 returns each included a Schedule C, Profit or Loss From Business, that listed the business as Stardust. Petitioner claimed income and expense items for Stardust on the Schedules C. For 1988, petitioner claimed an expense of $6,540 for commissions. Petitioner issued Forms 1099-MISC to three models in 1988 for total commissions of $6,030. For 1989, petitioner claimed an expense of $17,830 for wages. Petitioner issued Forms 1099-MISC to six models in 1989 for total wages of $16,530.

During the years in issue, petitioner's wife, Kathy Hardy (Mrs. Hardy), worked at Clairol. She filed her Forms 1040 for 1988 and 1989 and claimed as her filing status married filing separate. Her adjusted gross income for 1988 and 1989 was $17,996 and $19,890, respectively.

Petitioner, Mrs. Hardy, and Mrs. Hardy's daughter resided at petitioner's parents' home in Oxnard, California, from September 1986 through July 1988. On July 9, 1988, petitioner and Mrs. Hardy executed a residential rental agreement to rent a home in Oxnard for $930 per month. As part of the rental agreement, petitioner paid the new landlord $3,143 for the first and last

months' rent and a security deposit.  In 1990, petitioner and Mrs. Hardy purchased, as joint tenants, a home on Eastridge Loop in Oxnard for $265,000.  They made a downpayment of $53,000 towards the purchase price.

In approximately September 1990, the Oxnard Police Department began an investigation of Stardust for "in-call, out-call prostitution service".  Police officer Michael Williamson was involved in the surveillance, execution of the search warrants, interviews of suspects, and completion of reports.  The Criminal Investigations Division of the Internal Revenue Service (IRS) was also involved in the investigation.  A search warrant was executed at petitioner's parents' home.  The police seized paperwork, a briefcase, and other items relating to Stardust showing the name Henry Hardy.  The briefcase contained paperwork, bills, receipts, and calendars.  The calendars were for 1987 through 1989.  The police also executed a search warrant at petitioner's home on Eastridge Loop.  The police seized a 1990 calendar from the Eastridge Loop location.

Beginning with December 1987 and throughout the years in issue, the calendars contained "X" marks.  The X marks were placed on Mondays through Saturdays.  There were no X marks on a Sunday.  There were numerical notations at the end of various weeks and months on the calendars.  The notations often consisted of a total of the number of X's for the week or month and of another number that equaled the number of X's multiplied by

petitioner's percentage of the fees that Stardust charged for a session. The X's were often in different color inks on the same day.

In September 1991, in a criminal trial in the Superior Court of California, County of Ventura, petitioner was convicted of nine counts of pandering and two counts of pimping in connection with his operation of Stardust. In March 1993, the Court of Appeals of the State of California, Second Appellate District, Division Six, conditionally reversed and remanded petitioner's State court conviction for further action on petitioner's discriminatory prosecution claim. Petitioner subsequently pleaded guilty to nine counts of pandering and two counts of pimping by a Felony Disposition Statement filed July 21, 1993.

In October 1992, the IRS began an audit of petitioner's 1988 and 1989 Federal income tax returns. Revenue Agent James Deguchi (Deguchi) received the 1988 return, transcripts, and information obtained from the Criminal Investigations Division of the IRS. Deguchi made copies of numerous documents, including the calendars that were obtained through use of the search warrants. Deguchi counted the number of X's on the calendars for 1988 and 1989 and multiplied the number by $50 to establish petitioner's gross income from Stardust. Deguchi was aware that many of the sessions were 1-hour sessions and outcalls for which petitioner received a higher fee, but Deguchi used only the half-hour fee in his computations. Deguchi used the same method to determine

petitioner's 1990 gross income. Because the reconstructed income was sufficiently similar to the income that petitioner had reported on his 1990 Schedule C, the IRS decided not to pursue an audit of petitioner's 1990 Federal tax return. As a result of the audit, respondent sent a statutory notice of deficiency to petitioner for 1988 and 1989 on April 9, 1993.

OPINION

Respondent argues that petitioner understated his income from Stardust in 1988 and 1989. Respondent contends that petitioner maintained inadequate books and records and that the calendars are the most accurate reflection of petitioner's income. Respondent also argues that petitioner underpaid his taxes for both years due to fraud and, accordingly, that section 6501(c)(1) permits assessment at any time.

Petitioner asserts that his records accurately reflect income. On brief, petitioner states that he placed the X marks on the calendars not to count income but to "tell if the dancers were stealing customers, determine how effective telephones were being handled, and gauge the potential profits to be made if the business were being handled correctly". Petitioner further asserts that respondent has not satisfied her burden of proving fraud either for penalty purposes or for statute of limitations purposes.

The addition to tax and penalty in the case of fraud are civil sanctions provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and for the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of an underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). If respondent establishes that any portion of the underpayment is treated as attributable to fraud, the entire underpayment is treated as attributable to fraud and subject to the 75-percent addition to tax or penalty unless the taxpayer establishes that some part of the underpayment is not attributable to fraud. Secs. 6653(b), 6663(b). This burden is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct

proof of the taxpayer's intent is rarely available.  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).  A pattern of consistent underreporting of income for a number of years, when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years.  Holland v. Commissioner, 348 U.S. 121, 137 (1954); Otsuki v. Commissioner, supra.

Under section 61, gross income includes "all income from whatever source derived."  Gross income includes funds derived from legal and illegal sources.  Rutkin v. United States, 343 U.S. 130 (1952).  Where a taxpayer keeps no books and records, or the taxpayer fails to file a return from which his income tax liability can be assessed, the IRS may reconstruct the taxpayer's income.  Sec. 446(b); Moore v. Commissioner, 722 F.2d 193 (5th Cir. 1984), affg. T.C. Memo. 1983-20.  The IRS has great latitude in reconstruction methods.  Giddio v. Commissioner, 54 T.C. 1530, 1532-1534 (1970).  As a general rule, the computation of taxable income is made under the method of accounting regularly employed by the taxpayer or, if no method of accounting has been used by the taxpayer, made under such method as, in the opinion of respondent, clearly reflects income.  Sec. 446(b); Moore v. Commissioner, supra; Giddio v. Commissioner, supra.  This Court has approved the use of "trick sheets" to reconstruct a

taxpayer's income from prostitution.  Cooper v. Commissioner, T.C. Memo. 1987-303.

In cases of unreported illegal income, respondent must establish that the deficiency determination is supported by a proper foundation of substantive evidence.  Weimerskirch v. Commissioner, 596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977).  In this case, petitioner admits that the source of his income was from Stardust.  Only the amount of income is in dispute.

Respondent substantiates her assertion of unreported income with the calendars, the purported business records of Stardust, the evidence of petitioner's expenditures not explained by reported income, and testimony of petitioner and several of the models.  Respondent maintains that petitioner's business records are inaccurate representations of the number of models' sessions.

Petitioner argues that the transcribed business records are accurate and that they bear resemblance to the originals sufficiently to show that petitioner is not liable for additional tax.  Petitioner argues that he had the originals copied because they were stained with coffee or cola and that the originals "turned up missing" after the police executed a search warrant at Stardust.

At the criminal trial and at trial of this case, various models testified consistently about walk-in customers, length of sessions, triangle sessions, and outcalls.  Their testimony was

corroborated and credible.  Petitioner's purported business records do not reflect the income produced from the sessions described by the models.  We conclude, therefore, that the records are not complete or accurate.

Respondent's agent examined the calendars and the notations on the calendars.  Respondent's calculation of the number of X's on the calendars multiplied by petitioner's fee corresponded with the notations that petitioner made on the calendars. Petitioner's explanation is that the X's represent telephone calls to Stardust.  Petitioner testified that, after midnight, he would call his answering machine from his home.  He would listen to the messages and record an X for every five calls that came in.  He stated that he had a goal of getting one customer for every five calls and that listening to the messages helped him to determine if he was reaching his goal.

Petitioner's explanation is contradicted by the evidence. The X marks on the calendars were in different colors of ink on the same day.  No X marks were shown on Sundays, which would imply that there were no calls on a Sunday from the inception of the business until the termination of the business.  Petitioner's wife testified that she never saw petitioner use the calendars at home.  Many of the dates on the calendars contain 10 or more X's, which would mean that petitioner would have had to have listened to 50 telephone messages at home, after midnight, while marking X's on the calendars.

From the entire record, we are convinced that the calendars reflect petitioner's business receipts, as respondent has argued, and we reject petitioner's improbable explanation.

Respondent's determination is corroborated by evidence of petitioner's expenditures in excess of reported income. Petitioner has not offered a credible explanation for many of his expenditures described in the testimony and exhibits, such as the $53,000 downpayment on the Eastridge Loop home.

The evidence is clear and convincing that petitioner received income from Stardust and the models and that petitioner did not report all of the income. Thus, respondent has proven an understatement of income. Even in criminal cases, where the Government bears the burden of proof beyond a reasonable doubt, proof of unreported income is sufficient to establish an underpayment of tax absent proof by the taxpayer of offsetting expenses. See, e.g., Elwert v. United States, 231 F.2d 928, 933-936 (9th Cir. 1956). A fortiori, that proof is sufficient in this civil case. Although respondent has conceded that petitioner is entitled to additional expenses for costs of labor, those expenses are less than the unreported income. Petitioner's testimony that he did not underreport his income is implausible and not credible. Respondent has proven an understatement by clear and convincing evidence.

Respondent must also prove fraudulent intent. Fraudulent intent may be inferred from various kinds of circumstantial

evidence, or "badges of fraud", including an understatement of income, inadequate records, implausible or inconsistent explanations of behavior, engaging in illegal activities, attempting to conceal the illegal activities, and dealing in cash.  <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; <u>Meier v. Commissioner</u>, 91 T.C. 273, 297-298 (1988).

The facts in this case include many "badges of fraud". Petitioner kept inadequate books and records for Stardust and created false records.  Petitioner's explanations for the X marks on the calendars are implausible and not credible.  Petitioner engaged in illegal activities.  Stardust operated as a "cash only" business.

Respondent has proven by clear and convincing evidence an underpayment of tax due to fraud for each year.  Petitioner has not proven that any part of the underpayment is not attributable to fraud.  See secs. 6653(b)(2), 6663(b).

Section 6501(c)(1) provides:  "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time."  Assessment for 1988 is not barred.

<u>Decision will be entered</u>

<u>under Rule 155</u>.
